RICHARD E. PARKER AND JANA J. PARKER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15374-81.    Filed April 2, 1986.

*Sidney J. Machtinger, John S. Pennish, Thomas J. Ellsworth,* and *Charles N. Shephard,* for the petitioners.
*Fera Wagner* and *Gilbert Gembacz,* for the respondent.

COHEN, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes as follows:

negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

| Year | Deficiency | Addition to tax sec. 6653(a)[1] |
|------|-----------|------------------------------|
| 1977 | $2,925 | 0 |
| 1978 | 18,316 | $916 |
| 1979 | 29,458 | 1,473 |

The deficiencies resulted from disallowance of a deduction of $7,500, paid to Einar Erickson in 1977, and disallowance of a claimed charitable contribution deduction of $125,000 in 1978, carried over in part to 1979. By amendment to the answer, respondent seeks additional interest under section 6621(d) for 1978 and 1979 on the ground that the claimed contribution was a valuation overstatement within the meaning of section 6659(c).

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts is incorporated herein by this reference. Petitioners were residents of Phoenix, Arizona, at the time they filed their petition herein. They timely filed joint individual income tax returns for the years 1977, 1978, and 1979.

Petitioner Richard Parker (petitioner) and Duane Johnston (Johnston) are brothers-in-law who have been employed for many years by the same employer and who have associated closely in business and social matters. Johnston is a certified public accountant (CPA) but does not practice accounting. Neither petitioner nor Johnston had any experience in mining precious metals.

In 1977, Jim Allen, a CPA for the business operated by petitioner and Johnston, petitioner's return preparer, and a close friend of petitioner's, mentioned Einar Erickson (Erickson) to petitioner and Johnston. Petitioner had prior contact with Erickson years earlier when he attended lectures Erickson presented on the subject of the Dead Sea Scrolls, a subject on which Erickson was an authority. Petitioner and Johnston were advised that the Erickson program required a minimum investment of $15,000.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

On or about July 25, 1977, petitioners paid $7,500 to Erickson. On or about August 15, 1977, petitioner received from Erickson a "Temporary Receipt" and a "Consultant Geologist Statement," as follows:

### TEMPORARY RECEIPT

Please accept this as a temporary receipt for: $7,500.00 covering geological services and exploration in the following mining district: EUREKA (DIAMOND-SILVERADO REGION)

In the County of: EUREKA Nevada.

A CERTIFICATE OF LOCATION of any lode claims or claim that may be staked in your name will be forwarded as soon as the work has been accomplished and the Certificate recorded in the County Recorder's Office.

A CLAIM MAP showing the location of your claims, and a SUMMARY PRELIMINARY GEOLOGICAL REPORT, of the project area, and INDEX MAPS, will also be prepared and forwarded to you.

This RECEIPT will be for your records until I can forward to you the formal STATEMENT and documents and data.

(S) Einar C. Erickson
EINAR C. ERICKSON
*Registered Professional*
*Engineer Nevada 1653*

ENCLOSED: SUMMARY REPORT
INDEX MAP
CLAIM MAP - to be sent when recorded and filed.
EXPLORATION AGREEMENT
OTHER ITEM
U.S.G.S. MAPS

### CONSULTANT GEOLOGIST STATEMENT

FOR: PRELIMINARY GEOLOGICAL SERVICES AND EXPLORA-TION RENDERED ON AND/OR AROUND THE FOLLOWING CLAIM:

SILVERADO-DIAMOND GROUP

| | | |
|---|---|---|
| LOCATED IN THE: | EUREKA | MINING DISTRICT |
| | (DIAMOND-SILVERADO REGION) | |
| COUNTY OF: | EUREKA | NEVADA |
| TOTAL: | $7,500.00 | |

Einar C. Erickson,
*Registered Professional*
*Engineer Nevada 1653*

REPORTS, MAPS, AND DATA UNDER SEPARATE COVER

Johnston also sent Erickson $7,500. Petitioners and the Johnstons decided to share the $15,000 required for the investment because neither couple could justify financially investing the full amount.

On September 20, 1977, a Certificate of Location of Lode Mining Claim for Claim No. 79 in the Diamond Silverado project and a Certificate of Location of Lode Mining Claim for Claim No. 82 in the Diamond Silverado project were recorded on behalf of petitioners and on behalf of Johnston and Pamela J. Johnston. The certificates recited that claim maps had been filed with the County Recorder in Nye County, Nevada, although the claims were located in Eureka County, Nevada. A map was filed with the Bureau of Land Management showing the location of Diamond Silverado Claim No. 82 as section 29 of Township 19 North, Range 53 East, of the Mount Diablo Meridian, Nevada. The correct location of the claim is section 30, of Township 19. This error was not discovered by Erickson or petitioners until preparation for trial of the within case. A corrected map was not prepared until about 4 weeks prior to trial and had not been recorded as of the time of trial in September 1985.

During 1977 and 1978, petitioners received periodic reports from Erickson, suggesting that exploration work was being performed in the general area of their claims. On or about December 1, 1978, petitioners received a letter from Erickson stating that claim "#S-82" had a value of not less than $125,000. Erickson was referring to a one-half interest in Diamond Silverado Claim No. 82 (DS 82).

In December 1978, petitioners conducted their yearend tax planning and discussed with their tax advisors what, if anything, should be done with DS 82. They decided to donate DS 82 to Brigham Young University (the university), the school from which both petitioners and Johnston had graduated. On December 26, 1978, petitioner wrote a letter to the university in which petitioner donated his "entire 50% undivided interest" in DS 82 to the university. Petitioner's letter incorrectly described the claim as being in section 29 of Township 19. The university had also accepted other claims similar to DS 82, but, as of the time of trial, had not caused any development of DS 82.

On their 1977 tax return, petitioners deducted $7,500 on Schedule C as exploration expense. On their 1978 Federal income tax return, petitioners claimed a charitable contribution deduction in the amount of $14,186 relating to the donation of DS 82 to the university. On their 1979 income tax return, petitioners claimed a charitable contribution deduction in the amount of $41,415, reflecting a carryover of the charitable contribution relating to DS 82. Those contributions were erroneously shown on Schedule A of petitioners' tax returns for 1978 and 1979 as "cash contributions." Petitioner did not believe, at the time of donation of DS 82 to the university, that he was contributing "hard dollars." The nature of the contribution, however, was disclosed on attachments to the tax returns for 1978 and 1979, and copies of Erickson's letter to petitioners concerning the value of DS 82 were attached to those returns.

Erickson is a registered professional engineer who received a bachelor of science degree in chemistry and geology in 1954 and a master's degree in economic geology in 1957, both from Brigham Young University. He has taught or lectured on geology and mining at Brigham Young University and other universities. He has acted as a consultant for various companies. He is an exploration geologist, a hydrogeologist, a pyro-metallurgist and a metallurgist, a licensed drilling contractor, and a mining engineer. Erickson claims that DS 82 had a value in December 1978 of not less than $250,000 ($125,000 for a 50-percent interest) either separately or as part of a "consolidation." Essentially, Erickson's theory of consolidation is that claims of investors in his various projects may be joined together and valued on the basis of the total ore in other areas in Nevada controlled by him through staking of claims or through leases. The areas joined by such method are selected solely by Erickson and are not necessarily contiguous or even near each other. No investor in Erickson's projects is required to participate in the consolidation.

Erickson's Diamond Silverado mining project consisted of more than 350 claims staked in at least 16 separate areas of Nevada, together with 22 mill sites located in the Alhambra Hills, east of Eureka, Nevada. According to Erickson, part of the Diamond Silverado project was the diamond mine, in

which large discoveries were made between 1969 and 1972. Petitioner, however, did not have any contractual rights to the product of any areas other than Diamond Silverado Claims No. 79 and DS 82. According to Erickson, "Silverado Claim No. 82 is in one of the least accessible, studied and developed zones of the region. It is virtually, therefore, virgin ground with one of the highest potentialities."

Erickson first became familiar with the Diamond Silverado area in about 1956. He began investigations in the area in 1956 and 1957, and by 1976 nearly two-thirds of the total property positions that ultimately he staked for investors had been acquired. Between 1952 and 1972 Erickson had secured Federal Government loans for activities in the Diamond Silverado area.

Beginning in the 1950's, Erickson staked approximately 12,000 claims in Nevada, 5,000 of which were staked in the late 1970's as a part of eight projects. Claims in each project were categorized as "A" claims and "B" claims. Approximately 189 claims in the Diamond Silverado project, including DS 82, were identified by Erickson as "A" claims, i.e., claims containing physical evidence of mineralization.

In late 1978, Erickson evaluated approximately 750 claims in his various projects. A substantial number of those claims, if not all, were valued by Erickson at $250,000 each. If a claim holder requested that Erickson's valuation be increased over the amount originally set forth, Erickson would comply. In at least one instance, he increased the value by $25,000 at the request of the claim holder.

Erickson investments were promoted by the use of a document entitled "Client Benefits for Hiring the Professional Services of an Exploration Geologist," which was provided to most, if not all, of the investors. The purported benefits as described by Erickson in that document were as follows:

1. Such exploration activities and expenditures are 100% tax deductible for all such fees paid for exploration in the calendar year expended:

SEE: Internal Revenue Code Section 617: also note 613 Revenue Rule 70-287.

ADDITIONAL HELPFUL INFORMATION: Commerce Clearing House 1975 Standard Federal Tax Reports Paragraph 3580 A; Commerce Clearing House, 1976 Federal Tax Course page 1419; Prentice-Hall, Inc. Internal Revenue Code 1954 (I.R.C.) page 25,274.

2. Client will have staked in his name one or more twenty acre "Lode Mining Claims" as the normal results of exploration activities in a mining district or mineralized region. Please note the STANDARD EXPLORATION AGREEMENT. This outlines the terms of the working arrangement. *Item 7 states the geologist will retain no interest in the claims staked for the client. Each client has total control and autonomy as it relates to his exploration activitity [sic] and any claims.* Over the years clients have asked what they could do with their claims. Listed below are some alternatives that a client might consider:

a. Donate some or all of the mineral claims that the client may have had staked in his name to a qualifying charitable institution. It is suggested that only appreciated capital gains property that qualifies under long term holding rules be so donated. The client can contact the gift officer of most such charitable institutions to obtain information about their requirements. Many have Directors of Mineral Development or offices that accept properties of merit. The Benefits to be derived from such a donation may be seen by examining the material listed as follows:

See: Internal Revenue Code Section 170

Additional helpful information: Commerce Clearing House paragraphs 1860 and 1862:

REGULATION - PARAGRAPH 1.170-1; Commerce Clearing House, 1976 Federal Tax Course page 919. Prentice Hall, Inc. Internal Revenue Code of 1954 (I.R.C.) 25,120.15. CARRY-OVER PROVISIONS - See Internal Revenue Code Section 170 (d). Additional helpful information: Commerce Clearing House 1975 Standard Federal Tax Reports paragraphs 1860 and 1863K,

REGULATION: Paragraph 1.170A-10; Commerce Clearing House 1976 Federal Tax Course page 921; Prentice-Hall, Inc. Internal Revenue Code of 1954 (I.R.C.) 25,120.21

b. The client may retain some or all of the mineral properties. If a client were to choose this alternative in the second year of retention, $100 worth of assessment work has to be done and filed for each 20 acre claim. For more information on this, the client could contact any geologist and work out the long range program of retention of any claims and on-going work.

If the client retains his properties there are several other possibilities.

1. The client could then expend additional funds for exploration under I.R.C. code Section 617.

2. Hold the properties for the future.

3. Donate in the future—see above, obtain advice of accountant or tax attorney.

4. Sell.

5. Lease.

6. Joint-Venture.

7. Continue to expend funds to prove out additional merit of the property.

8. Hold property and watch developments in the region to ascertain possible disposition of properties.

9. Develop property when merit has been established.

c. Sell some or all of the mineral properties to a mining and development company, a private individual or others.

d. Lease some or all of the mineral properties to a mining or development company, a private individual, or others. Under this arrangement the Client may elect to take any lease payments in bullion silver. See IRC Section 613.

(*All of the above decisions to be made by the client. Geologist retains no interest in any claims located for clients.*)

3. Any communications with geologist, field visits, or other, as a professional meeting would be tax deductible.

4. The Client may wish to participate in future exploration projects. The Client should check with and obtain the expert advice of accounting advisors and or tax attorneys for other alternatives and flexibilities such exploration activities provide and in the evaluation of all of the above.

[Emphasis aupplied.]

When funds were received from petitioner and Johnston, they were disbursed by Erickson to various bank accounts in the names of entities owned or controlled by him. Some of the funds thus disbursed were used for various mining activities conducted by Erickson throughout Nevada and in which neither petitioner nor Johnston had any interest. Jim Allen (Allen) was reimbursed travel expenses of $500 by Erickson from funds paid by petitioner and Johnston. On a ledger sheet prepared by or at the direction of Erickson, the amount paid to Allen was recorded as incurred for "geology." In Erickson's mind, "geology * * * is a catch word for anything else that was necessary for the ongoing project and expenses." Allen did not perform any exploration or other geological services.

Claims in the Erickson's mining projects, including the ones obtained by petitioner, were staked by Erickson's younger brother, Lynn Erickson (L. Erickson). Between 1975 and 1980, L. Erickson staked approximately 5,000 claims at his brother's direction. L. Erickson staked between 10 and 20 claims per day. With respect to the

staking, mapping, and recordation of petitioner's claims, $1,000 was paid to Eagle Exploration Services, an entity owned by L. Erickson and by Einar Erickson's son, Ranel Erickson. L. Erickson operated Eagle Exploration Services, but Einar Erickson had authority over the bank account of the company. Einar Erickson was paid directly $670 in relation to staking of petitioner's claims. The normal average cost of having a third party stake, map, and record a mining claim in an area similar to the one in which petitioner's claims are located is $100 per claim.

At the suggestion of Erickson, petitioner employed Dr. Mead Jensen (Jensen), a professor of geology at the University of Utah, to evaluate DS 82. Jensen received a Ph.D. in geology from the Massachusetts Institute of Technology in 1951. He taught at Yale University for 14 years. Prior to 1977, he published numerous articles on geological subjects. Commencing in about 1977, Erickson employed Jensen to perform certain geological work and make evaluations for Erickson's investors. Jensen was paid approximately $300 per day in consulting fees to do various types of geology work and make evaluations for Erickson's investors.

Jensen visited the area of DS 82 three times in 1985, twice with Erickson. Jensen valued DS 82 on the basis of samples taken from two mine dumps that, according to Erickson and Jensen, were within the boundaries of DS 82. Jensen made certain assumptions about processing the material in the mine dumps, including hauling the dump material to an existing heap leaching facility, leaching the rock on the site, and hauling the dump material to a refinery and smelter. Jensen calculated projected gross receipts from these processes and deducted the assumed costs of each process. He arrived at "net values" under each option of $41,430, $65,430, and $42,174. None of his assumptions were supported by independent corroboration. Jensen did not determine the fair market value of DS 82 in terms of the price at which the claim would change hands between a willing buyer and a willing seller, neither under any compulsion to buy or sell and both having knowledge of relevant facts.

Respondent employed Reb Bennett (Bennett), a geologist with the Bureau of Land Management (BLM) to examine DS 82. Bennett received bachelor's and master's degrees in geology from San Jose State University. Bennett's primary function at the BLM was to evaluate mineral potential of BLM lands and to determine the value and validity of unpatented mining claims under U.S. mining laws. (Unpatented claims are on land owned by the Government. The claim holders, such as petitioner, have the right to exploit any minerals in the claim areas.) Bennett concluded that the mine dumps sampled by Erickson and Jensen were not within the boundaries of DS 82. Bennett concluded that DS 82 had no value. He also concluded that the claim was overlapped by patented claims and was invalid under the requirements of the Federal mining laws as of the date of donation.

Respondent also employed Dr. Anthony Payne (Payne) to evaluate DS 82. Payne received bachelor's and master's degrees from the University of Utah and a Ph.D. in economic geology from Stanford University. Most of his professional career involved valuing unpatented mining claims. Payne had taught at the Mac Kay School of Mines and conducted mining operations on his own account. From 1979 through the date of trial, Payne was employed by the Internal Revenue Service as an independent consultant to investigate all of the Erickson projects. Payne specifically examined DS 82 and concluded that it had no value. He reached similar conclusions with respect to all of the Erickson claims examined by him. Payne concluded that the mine dumps sampled by Erickson and Jensen were not within the boundaries of DS 82 and that, in any event, exploitation of ore in those dumps was not financially feasible.

## ULTIMATE FINDINGS OF FACT

The $7,500 paid to Erickson by petitioners in 1977 was spent by Erickson for things not constituting exploration on behalf of petitioners.

As of December 1978, Diamond Silverado Claim No. 82 had no more than nominal, if any, fair market value.

Petitioner knew or should have known that Diamond Silverado Claim No. 82 did not have a value justifying the charitable contribution deductions claimed on his 1978 and 1979 tax returns.

The value claimed to support the charitable contributions on petitioner's 1978 and 1979 tax returns far exceeded 150 percent of the correct value of Diamond Silverado Claim No. 82, and that valuation overstatement resulted in a substantial underpayment attributable to a tax-motivated transaction.

OPINION

Petitioner has the burden of proving that the statutory notice of deficiency is incorrect in disallowing the claimed exploration expense and charitable contribution deductions and in determining additions to tax for negligence. *Welch v. Helvering*, 290 U.S. 111 (1933); *Bixby v. Commissioner*, 58 T.C. 757 (1972). Because the additional interest under section 6621(d) was raised by an amendment to the answer, respondent has the burden of proving that there was a substantial underpayment in the years 1978 and 1979 attributable to a tax-motivated transaction, that is, that the value claimed for DS 82 exceeded 150 percent of the correct value of that claim on the date that it was donated to Brigham Young University. Secs. 6659(c), 6621(d). There is no dispute that the claim was actually given to the school and that the school was a qualified charity for purposes of section 170.

*The $7,500 Payment*

Section 617 allows a deduction for certain mining exploration expenditures, including:

expenditures paid or incurred during the taxable year for the purpose of ascertaining the existence, location, extent, or quality of any deposit of ore or other mineral, and paid or incurred before the beginning of the development stage of the mine * * *

Expenses paid or incurred for the development of a mine or other natural deposit, if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed, are deductible under section 616(a).

*Anderson v. Commissioner*, 83 T.C. 898 (1984), on appeal (10th Cir., Mar. 5, 1985). Sections 616 and 617 express the intent of Congress to allow the deduction of expenditures reasonably connected with preparations for extracting ore. See *Estate of DeBie v. Commissioner*, 56 T.C. 876, 892 (1971),[2] dealing with the predecessor of section 617. The deduction is intended to be an incentive for *increased* exploration for mineral deposits. S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 545. There are few guidelines provided to define further "exploration expenditures," and this case does not require that we attempt to provide a comprehensive definition that would serve all purposes. The costs of staking, mapping, and recording a claim would be excluded from deductible expenditures as the costs of acquiring the claim. See sec. 1.617-1(b)(4), Income Tax Regs.

Petitioners deny that the $7,500 paid to Erickson was for anything other than exploration expense. They deny that tax motives played a part in their arrangements with Erickson. They deny receiving the tax-oriented promotional materials distributed by Erickson to his investors. They have not produced or explained the absence of certain items purportedly enclosed with Erickson's "Temporary Receipt" delivered to them in August 1977. Most significantly they have not produced as a witness Allen, their tax consultant, who originally introduced them to the Erickson investment. If in fact they did not receive any enclosures with Erickson's temporary receipt, their failure to secure them suggests indifference to Erickson's actual activities. If they did receive them and did not produce them, their failure to do so, along with their failure to produce Allen, justifies the inference that such evidence would not support their contentions. See *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The testimony of petitioner and of Johnston concerning their donation of an asset allegedly worth $250,000 is incongruous if not incredible: According to them, they each paid $7,500 to Erickson because neither could justify paying $15,000. They did not anticipate donating the claim to

---

[2] See also *Baxter v. Commissioner*, T.C. Memo. 1985-415; *Kilroy v. Commissioner*, T.C. Memo. 1980-489; *Kilroy v. Commissioner*, T.C. Memo. 1973-7.

charity until tax planning time in late 1978. Then they expressed delight at their new found wealth and promptly gave it away. They would allocate none of the $15,000 payment to the costs of acquiring the claims.[3] Overall their testimony is unpersuasive.

Petitioners have no personal knowledge of any work done on their behalf and rely on Erickson's testimony as to the nature of the $7,500 payment. Erickson, however, obviously included in his description of "exploration services" items that are not contemplated by section 617. Erickson's "catch word" was "geology," an obviously misleading use of the term to include items such as reimbursement to Allen for expenses of flying to Nevada. In his testimony Erickson described his various activities by reference to the Internal Revenue Code section under which the activity was purportedly deductible. Erickson's list of "client benefits"—presumably what he was paid for—sets forth primarily anticipated tax benefits. That document represents that payments to him are "100 percent deductible" and then suggests, by emphasis and order of listing, that the best thing one can do with a claim is donate it to charity. Significantly lacking from his list of client benefits is any reasonable program for exploitation of any ore potential of a claim. The money paid to Erickson by petitioners was merely shifted among bank accounts controlled by Erickson. Ultimately, these funds were apparently spent solely on behalf of Erickson. There is no reliable evidence that any exploration was performed on behalf of petitioners.

Normally when an individual makes a payment to an independent contractor for a particular purpose, it may be assumed that the money is deductible if that purpose comes within a particular provision of the Internal Revenue Code. Where the item is disputed by respondent, however, and where the payee's testimony is produced but is unreliable, that testimony may be insufficient to satisfy petitioners' burden of proof. See *South Texas Rice Warehouse Co. v. Commissioner*, 366 F.2d 890, 897-898 (5th Cir. 1966), affg. 43 T.C. 540 (1965). Here Erickson's testimony is unreliable

---

[3] In response to an argument in respondent's opening brief, petitioners assert that if the full amount is treated as the cost of acquisition of two claims, one-half should be regarded as the cost and minimum fair market value of DS 82. No intermediate position is suggested.

because much of what he claims is exploration expense is not exploration expense within the language or intent of section 617. Petitioners, therefore, have not proven that they are entitled to deduct the sum of $7,500 paid to Erickson in 1977.

*Valuation of DS 82*

The applicable definition of fair market value is found in section 1.170A-1(c)(2) as follows:

The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * *

Petitioners first contend that that definition must be modified in this case because there is no market for mining claims. That contention, however, is not, as they suggest, supported by Erickson's testimony. Erickson testified that there are very few unpatented claims sold. He also testified that in October 1978 he had purchased a block of 104 *patented* claims (i.e., claims including the fee in the land) 1 or 2 miles from DS 82, and some other assets, for $180,000. The absence of an active market merely emphasizes the likelihood that the values claimed by Erickson and by petitioners have been grossly exaggerated.

This is not a case, therefore, where we are required to resort to an unusual method of determining value. See *Cupler v. Commissioner*, 64 T.C. 946, 955 (1975). In *Cupler*, cited by petitioners, we gave weight to the use to which the property is put by the donee. See also *Skripak v. Commissioner*, 84 T.C. 285, 322 (1985). In this case, that factor would hardly help petitioners, because so far as the record indicates, the university was the recipient of many claims but no valuable benefits from them. In any event, for the reasons set forth below, petitioners have not sustained their burden of proving the value contended by them or any value for DS 82 under any method.

Erickson, Jensen, Bennett, and Payne were all qualified by education and experience to express opinions on geological subjects. They did not agree, however, on the value of the claim or even the location of the claim. Even when

Jensen and Payne used the same general "income" method of determining value, they reached diametrically opposed results.

Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. Such evidence must be weighed in light of the demonstrated qualifications of the expert and all other evidence of value. *Estate of Christ v. Commissioner*, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. *Kreis' Estate v. Commissioner*, 227 F.2d 753, 755 (6th Cir. 1955); *Tripp v. Commissioner*, 337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938); *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; *In re Williams' Estate*, 256 F.2d 217, 219 (9th Cir. 1958), affg. a Memorandum Opinion of this Court. Thus we have rejected expert testimony where the witness' opinion of value was so exaggerated that his testimony was incredible. See *Chiu v. Commissioner*, 84 T.C. 722 (1985); *Dean v. Commissioner*, 83 T.C. 56, 75 (1984); *Fuchs v. Commissioner*, 83 T.C. 79, 99 (1984).

In *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980), we stated:

We are convinced that the valuation issue is capable of resolution by the parties themselves through an agreement which will reflect a compromise Solomon-like adjustment, thereby saving the expenditure of time, effort, and money by the parties and the Court—a process not likely to produce a better result. Indeed, each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. If the parties insist on our valuing any or all of the assets, we will. We do not intend to avoid our responsibilities but instead seek to administer to them more efficiently—a

factor which has become increasingly important in light of the constantly expanding workload of the Court.

That language should not be misinterpreted, as some litigants apparently have, as expressing an intention of the Court to sanction a party who takes an unreasonable position. See, e.g., the argument of the taxpayer in *Estate of Kaplin v. Commissioner*, 748 F.2d 1109, 1111-1112 (6th Cir. 1984), revg. on another ground a Memorandum Opinion of this Court.

Nothing in *Buffalo Tool & Die* requires us to accept any opinion that does not withstand careful analysis. If expert testimony is to serve its intended purpose, however, we should not and will not reject it without objective reasons for doing so. *Buffalo Tool & Die* simply indicates that an objective reason for doing so is that another expert's opinion is more persuasive. In addition, *Buffalo Tool & Die* does not require that we find that an expert's report is more persuasive in its entirety. We can find one such report more persuasive on one ultimate element of valuation and another more persuasive on another ultimate element.

In this case, neither party has given us any basis for an intermediate conclusion as to value. (See note 3 *supra*.) Petitioners suggest that we allow the deductions actually taken, totaling $55,591, for 1978 and 1979, but the evidence does not permit that result. Because each party bears the burden of proof on a specific issue, each party has a burden of convincing us that we should accept that party's opinion of value. For the reasons set forth below, we reject petitioners' experts' opinions. We agree with respondent's experts that DS 82 had no deductible value on the date of donation.

Each party argues that the opinions of the other party's experts should be rejected because of bias. There is a substantial difference, however, between (1) the promoter or seller of the item being valued, such as Erickson, and his paid consultant, Jensen, and (2) experts employed specifically in relation to a subsequent dispute and not otherwise having to vindicate opinions previously expressed by them. See *Chiu v. Commissioner*, 84 T.C. at 730. That Bennett did work for respondent under an arrangement with another Federal Government agency, by which he was employed,

and that Payne had earned substantial sums over a period of years evaluating Erickson projects for respondent, will be given little weight in the absence of objective indicia that their opinions are unreliable. It would be surprising to find any expert witness who is not paid for his testimony, or who testifies contrary to the position of the party who called him. Our decision here is based on the substance of the testimony and not on superficial attempts to discredit the witnesses.[4]

Erickson's testimony is not credible for numerous reasons. To the extent that he purported to value the claim individually based on dumps supposedly on DS 82, we must give consideration to the belatedly discovered error in the recorded map of claim; the failure to exploit those dumps over a period beginning in the 1950's and continuing approximately 30 years to the time of trial; the absence of independent corroboration; and the failure of his assumptions to support the exaggerated values attributed by him to so many claims in the area. He testified:

Q. What conclusions did you draw as to the value of Claim 82 based on the presence of the dump on Claim 82, the large lower dump?

A. That you would have a significant value. There'd be about 32,000 ounces of silver and 30,000 or so odd dollars in gold, so there'd be more than $200,000.00 in value in that dump alone in terms of gross value.

Q. And that would be the gross values of the dump?

A. Of that one dump, yes.

\* \* \* \* \* \* \*

A. \* \* \* We actually went in there in October, November of 1977 and got 30 ounces of silver off of 82.

Q. And what opinion do you have as to the value which can be shared throughout the Diamond Silverado project based upon the ores which are present in the Diamond Mine?

A. In all of the ore we had found, during the 1960, '70 drilling, we came up with over $330,000,000.00 worth of ore, discounted it 15 percent, came up with about $80,000,000.00. My 750 claims that I have valuated, came to less than $60,000,000.00, so that I had valuation on consolidation for all further claims.

---

[4] Petitioners ask us to take judicial notice of the testimony of Jensen in *Snyder v. Commissioner*, 86 T.C. 567 (1986), that a claim in issue there had no value on a nonconsolidated basis, as an indication that Jensen was independent. Our conclusion as to the reliability of Jensen's testimony is reinforced by the testimony in both cases.

There is no independent verification of any of Erickson's estimates. There is no independent corroboration that his consolidation theory is recognized in commercial mining, although, in the nature of things, if Erickson is right, numerous potential witnesses would exist. He acknowledged that more than 100 companies in Nevada, some of which had contracts with him, support teams of exploration geologists in the field. Yet no such witness was produced. There is no explanation why anyone with a valuable claim would give up a percentage of it to someone with a worthless claim. There is no evidence of the number of investors, if any, in the Diamond Silverado project, who at any time agreed to participate in a joint effort with respect to their claims. There is no evidence that petitioner, the university, or anyone ever made any attempt to convert to reality the values in Erickson's imagination.

Similar statements can be made about Jensen's testimony. There was no independent verification of his assumptions or any showing that his method or his estimates of costs were reasonable. Payne made the same calculations and came up with negative operating results. Payne argued persuasively that it would not be feasible to conduct a removal operation with respect to whatever ore might be found on DS 82, standing alone. Apparently, Jensen never considered a discount for the risk of nonrecovery—a matter that would be of great concern to a prospective purchaser. In response to a question about discount, he discussed depletion, a concept having to do with taxes, not fair market value. Common sense suggests that no one would pay Jensen's computed "net value" for DS 82.

Erickson's and Jensen's opinions as to the individual value of DS 82, of course, depended on the disputed location of the claim in relation to the dumps sampled. Because the claim was originally drawn in the wrong place on a map perhaps recorded in the wrong county, and the error was not corrected prior to trial, we again doubt the reliability of petitioners' witnesses. If DS 82 had substantial value, greater care would have been taken as to the accuracy of important documents. Respondent's experts testified categorically that the located stakes placed by L. Erickson indicated that the claim area did not include the

dumps. A reasonably informed prospective purchaser would have wanted this doubt resolved before giving much, if any, value to the material in the dumps. Certainly, a prospective purchaser would have secured better information about the costs of transforming the dump material into marketable ore and would have made some inquiry as to the relationship, if any, between the prices of precious metals on commodities exchanges and the price to be expected in the market in which the owner or operator of a mine is selling his product. Petitioners' evidence provided none of this information, although they assumed as fact the disputed elements of value. We cannot, therefore, attribute any significant value to DS 82, much less the excessive values contended for by petitioners and their experts.

It is not inconceivable that a speculator or a totally uninformed person might pay some nominal amount for a mining claim such as DS 82. We doubt that anyone would pay as much as $1,000 for that claim. Thus, even if we were to assume that the claim had a nominal value, respondent would have satisfied his burden of proving that the claim was overvalued by at least 150 percent. Petitioners have not established their entitlement to any deduction, however, because there is no credible evidence that the claim had any value.

### *Additions to Tax Under Section 6653(a)*

Petitioners contend that they relied on Allen with respect to the correctness of the tax returns, and they relied on Erickson with respect to the alleged value of the claim. They did not produce Allen as a witness. The total absence of objective support for the value claimed, however, requires that we sustain the additions to tax under section 6653(a). They claimed that they relied in good faith on Erickson when he told them that their $7,500 investment had grown to $125,000 in 1 year. As stated by the Court of Appeals for the Seventh Circuit in a comparable situation:

The many elements of commercial surrealism present in these tax shelters should have put a reasonable person on notice that he was not being shown all the cards in the deck. It is unfortunate that in their haste to obtain tax deductions taxpayers have put their common sense behind them and have become easy targets for tax shelter charlatans.

[*Saviano v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983).]

As stated by the Court of Appeals for the Ninth Circuit, to which this case is appealable, in a different tax-avoidance context, "No reasonable person would have trusted this scheme to work." *Hanson v. Commissioner*, 696 F.2d 1232, 1234 (9th Cir. 1983). See also *Barnard v. Commissioner*, 731 F.2d 230, 232-233 (4th Cir. 1984), affg. *Fox v. Commissioner*, 80 T.C. 972 (1983). In this case, petitioner admitted that he knew he was not giving up "hard dollars" when he conveyed his interest in DS 82 to the university, on the advice of his tax preparer, in December 1978. He claimed the deduction, however, as the equivalent of a cash contribution. The resulting deficiency in tax is due to negligence or intentional disregard of rules and regulations.

### Additional Interest Under Section 6621(d)

Section 6621(d) provides for an increase in the interest rate where there is a "substantial underpayment" (an underpayment of at least $1,000) in any taxable year "attributable to 1 or more tax motivated transactions." The additional interest accrues after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(d). *Solowiejczyk v. Commissioner*, 85 T.C. 552 (1985). A "tax motivated transaction" includes "any valuation overstatement (within the meaning of section 6659(c))." Sec. 6621(d)(3)(A)(i). Under section 6659(c), a "valuation overstatement" exists if the value of property claimed on a return is at least 150-percent greater than the amount determined to be the correct valuation of the property.

In this case, the additional interest was asserted by respondent by motion to amend the answer filed at trial after due notice had been given to petitioner. See *Law v. Commissioner*, 84 T.C. 985 (1985). Respondent bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.

We apply section 6621(d), even on our own motion in a case such as this, where petitioner made "blatant misuse of the charitable donation provisions" and "participated in a

scheme to generate egregious charitable contribution deductions through the gross overvaluation of the items donated." *Johnson v. Commissioner*, 85 T.C. 469, 483-484 (1985). Respondent has met his burden of proof, and petitioner is therefore liable for additional interest under section 6621(d).

*Decision will be entered under Rule 155.*

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.