T.C. Memo. 2000-51


UNITED STATES TAX COURT


ESTATE OF ETTA H. WEINBERG, DECEASED, MELLON BANK, DONALD
H. HERMAN AND LOUISE W. ALBERT, EXECUTORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5076-97.          Filed February 15, 2000.


Steven T. Stern and David J. Ackerman, for petitioners.

Alan S. Kline, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, Judge:  Respondent determined a deficiency

of $760,515 in the Federal estate tax of the estate of

Mrs. Etta H. Weinberg, herein referred to as the decedent.

After concessions by the parties, the sole issue for

decision is the fair market value of a limited partnership

interest over which the decedent had a general power of appointment on the date of her death.

Throughout this opinion, all section references are to the Internal Revenue Code as in effect on the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation and the accompanying exhibits are incorporated herein.

The decedent died on December 15, 1992. She was a resident of Philadelphia, Pennsylvania, at that time. She was also a widow. Her husband, Mr. Bernard Weinberg, had died in 1964. She was survived by two children from her marriage to Mr. Weinberg, Mr. Paul S. Weinberg and Ms. Louise W. Brown.

On the date of her death, the decedent possessed a general power of appointment over the principal of a so-called marital deduction trust that had been created under the last will and testament of her late husband (referred to herein as Trust A). Trust A held a 25.235-percent interest in a limited partnership, the Hill House Limited Partnership (Hill House).

Hill House owned and operated an apartment complex that consisted of an 11-story building containing 188 apartment units, an office suite, a two-level underground parking garage, and a swimming pool. The apartment complex had been constructed in 1964. At the time of the decedent's death, only three of the apartment units in the complex were vacant. As of December 31, 1992, there was one mortgage on the property in the principal amount of $448,544. The mortgage was payable in monthly installments of $18,406, including principal and interest at the annual rate of 6.25 percent. The final mortgage payment was due on April 1, 1993. The parties agree that on the date of the decedent's death the fair market value of the apartment complex was $10,050,000.

Hill House is governed by the Hill House Limited Partnership Agreement of May 1, 1980. Article IV of the agreement governs distributions to the partners. Paragraph 4.1 of the agreement gives the general partner sole discretion to determine when distributions are made. It further provides: "Such distributions shall be made pro rata to the Partners in accordance with their respective Percentage Interests." Article VII of the agreement governs the transferability of partnership interests, and paragraph 7.3 thereof gives all partners a right of first

refusal under which a partner who wishes to transfer his, her, or its interest in Hill House to a third party must first offer to sell the interest to the other partners on the same terms and conditions offered by the third party. Paragraph 7.4 of the agreement gives the general partner absolute discretion to consent to or deny the substitution of a limited partner, unless the purchaser is already a partner.

The Limited Partnership Agreement sets forth the following list of partners and the percentage interest of each:

| General Partner | Percentage Interest |
| --- | --- |
| Paul S. Weinberg | 1.000 |

| Limited Partners | |
| --- | --- |
| Trust A | 25.235 |
| Paul Trust | 14.982 |
| Etta H. Weinberg, copartner in M.E.L. Realty Co. | 14.395 |
| Anne K. Gross, copartner of M.E.L. Realty Co. | 8.648 |
| Barbara G. Reines, copartner in M.E.L. Realty Co. | 8.648 |
| Paul Trust, copartner in M.E.L. Realty Co. | 14.395 |
| Anne K. Gross | 9.390 |
| Max and Esther S. Oppenheim | 3.307 |

As shown above, the decedent's son, Mr. Paul S. Weinberg, was the sole general partner of Hill House and

held a 1-percent interest in the partnership in that capacity. He was also the sole beneficiary of the Paul S. Weinberg Testamentary Trust that had been created under his father's last will and testament (referred to above and herein as the Paul Trust). The Paul Trust had a limited partnership interest of 14.982 percent in Hill House and an additional interest of 14.395 percent in Hill House as a copartner of M.E.L. Realty Co.

On November 2, 1984, the decedent created an inter vivos trust, and on February 17, 1989, she substantially amended it. The amended trust directed that upon the decedent's death the trustees were to distribute all the decedent's interests in Hill House to a trust that she had created earlier for the benefit of her son, Mr. Paul S. Weinberg, and his issue (the Paul Family Trust). This distribution was to include the 25.235-percent interest in Hill House held in Trust A, over which the decedent possessed a general power of appointment. The decedent's will states that the decedent exercised her power of appointment over the subject limited partnership interest as provided in the amended trust. Her will states as follows:

> I exercise in full the power of appointment given to me under Article III of the Last Will

and Testament of my late husband, BERNARD WEINBERG, and direct that all assets governed thereby be distributed to my Trustees under my Trust executed November 2, 1984, as amended, whereunder I am now Trustee.  In the event that such Trust, for any reason, is not in existence at the time of my death, I exercise my power of appointment in favor of my Executors.

The financial statements of Hill House for the years 1990 through 1992 report the following:

|  | 1990 | 1991 | 1992 |
|---|---|---|---|
| Rental income | $1,928,127 | $2,003,912 | $2,057,151 |
| Total income | 1,996,306 | 2,082,707 | 2,137,058 |
| Net income | 754,465 | 893,678 | 843,275 |
| Cash | 722,128 | 836,450 | 801,078 |
| Mortgage payable | 810,211 | 635,012 | 48,544 |
| Distributions | 650,000 | 600,000 | 800,000 |

On the estate tax return filed on behalf of the decedent's estate, the executors of the estate reported $1,075,000 as the value of the 25.235-percent interest in Hill House over which the decedent held a general power of appointment.  The estate now claims that the fair market value is $971,838.  In the notice of deficiency, respondent determined that the fair market value of the subject interest in Hill House was $2,422,500.  Respondent now claims that the fair market value is $1,770,103.

OPINION

Section 2031(a) provides that the value of the gross estate of a decedent is determined by including the value at the time of the decedent's death of all property, real or personal, tangible or intangible, wherever situated. Section 2041 provides generally that a decedent's gross estate shall include the value of all property over which the decedent has a general power of appointment at the time of his or her death. See sec. 2041(a)(2).

As mentioned above, at the time of her death, the decedent possessed a general power of appointment over a 25.235-percent limited partnership interest in Hill House. In this opinion, we sometimes refer to this interest as the subject limited partnership interest. Thus, the decedent's gross estate includes the value of this interest. The sole issue for decision in this case is the fair market value of the subject limited partnership interest.

Fair market value is defined for Federal estate and gift tax purposes as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the relevant facts. See sec. 20.2031-1(b), Estate Tax Regs.; United States v.

Cartwright, 411 U.S. 546, 551 (1973); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982). This is an objective test based upon hypothetical buyers and sellers in the marketplace and is not based upon a particular buyer or seller. See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Andrews v. Commissioner, supra at 956.

The value of an item of property as of the date of a person's death is a question of fact. See Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). The taxpayer bears the burden of proving that respondent's determination of fair market value of property is incorrect. See Rule 142(a). The Court as the trier of fact must weight all relevant evidence and draw appropriate inferences. See, e.g., Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989).

The determination of fair market value is an inherently imprecise process. See Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987); Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980). On numerous occasions, this Court has stressed the appropriateness of settling valuation issues. See Estate

of Andrews, supra at 956; Buffalo Tool & Die Manufacturing Co. v. Commissioner, supra at 452; Messing v. Commissioner, 48 T.C. 502, 512 (1967); Furman v. Commissioner, T.C. Memo. 1998-157.

In this case, the parties agree that in valuing the subject limited partnership interest a minority discount and a lack of marketability discount must be applied. The minority discount accounts for a decedent's lack of control over the property. See Ward v. Commissioner, 87 T.C. 78, 106 (1986); Harwood v. Commissioner, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Andrews v. Commissioner, supra at 953. The lack of marketability discount accounts for the fact that there is no ready market for a decedent's interest in the property. See Estate of Andrews v. Commissioner, supra at 953. While the parties agree that both discounts are appropriate, they disagree about the amount of each discount, and, thus, they disagree about the value of the subject limited partnership's interest.

To establish the value of the subject limited partnership interest, the parties rely upon the testimony and report of their respective expert witnesses. The Court evaluates an expert opinion in light of the demonstrated

qualifications of the expert and all other evidence of value.  See Estate of Newhouse v. Commissioner, supra at 217; Parker v. Commissioner, 86 T.C. 547, 561 (1986).  The Court is not bound by the opinion of any expert witness. See Estate of Newhouse v. Commissioner, supra at 217; Estate of Hall v. Commissioner, supra at 338; Parker v. Commissioner, 86 T.C. at 561.  The Court may adopt an expert's entire opinion or selectively choose to adopt some portion of the expert's opinion.  See Parker v. Commissioner, supra at 562.  Because valuation necessarily results in an approximation, the value at which the Court arrives need not be one as to which there is specific testimony if it is within the range of values that may properly be arrived at from consideration of all the evidence.  See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

Petitioners' Expert

Petitioners rely on the expert report of Mr. Robert M. Siwicki of Howard, Lawson & Co.  Mr. Siwicki is an accredited senior appraiser with the American Society of Appraisers and holds a master's degree in finance from the Wharton School.

Mr. Siwicki valued the subject limited partnership interest using both the capitalization of income approach and the net asset value approach. Under the capitalization of income approach, it is necessary to identify the income stream to be capitalized. The income stream is then capitalized using a rate of return realized by hypothetical investors on comparable investments. Under the net asset value approach, it is necessary to determine the net asset value of the asset. If necessary, that value is then discounted to reflect the minority ownership of the interest.

Mr. Siwicki started his valuation in this case by reviewing the data on 85 publicly registered real estate partnerships compiled in the May/June 1992 edition of "The Perspective", a bimonthly publication of Partnership Profiles, Inc., which provides market data for publicly registered limited partnership interests. Mr. Siwicki focused on limited partnerships that invested in residential property, had little or no debt, and made cash distributions to the limited partners. He identified seven publicly registered real estate partnerships that he believed were comparable to Hill House. They are listed

below with their yield and discount to net asset value
(NAV):

| Partnership | Type of Investment | Yield | Discount to NAV |
|---|---|---|---|
| American Insured Mortgage 86 | M | 10.6% | 35% |
| American Insured Mortgage 88 | M | 9.1% | 30% |
| Hutton/ConAm Realty Investors 4 | E | 8.9% | NA[3] |
| IDS/Balcor Income Properties | E | 11.1% | 51% |
| Krupp Insured Plus | M | 10.9% | 29% |
| Krupp Insured Plus II | M | 10.1% | 13% |
| Shearson Lehman Sr. Income Fund | E | 11.5% | NA[3] |

[3] Not available.

Four of the above partnerships, those with an "M" in the
column entitled Type of Investment, did not own real
properties but invested in portfolios of federally insured
mortgages. Mr. Siwicki believed that they were "less risky
than their equity-based counterparts" and "would be
expected to have lower discounts to NAV compared to equity-
based real estate partnerships." He selected the IDS
Balcor Income Properties, a partnership that owned only two
apartment buildings, as the limited partnership that was
most comparable to Hill House that owned a single property.
The data for IDS Balcor reported a yield of approximately
11 percent and a net asset value discount of 51 percent.

In identifying an appropriate income stream,
Mr. Siwicki noted that there was a "disconnect between the
performance of the [Hill House] partnership and the amount
of distributions being made". For that reason, he chose as

the income stream a 3-year average of the cash distributions made during the years 1990 through 1992, $683,333 (i.e., total distributions during 3-year period, $2,050,000, divided by 3). In calculating the average distributions, Mr. Siwicki did not adjust the average to take into account the final mortgage payment due on April 1, 1993.

A 25.235-percent share of the 3-year average of cash distributions (i.e., the share attributable to the subject limited partnership interest) is $172,439 (i.e., $683,333 x 25.235 percent). Mr. Siwicki capitalized that amount, $172,439, by 11 percent, the approximate yield of an interest in IDS Balcor, to arrive at $1,567,627 as the value of the subject limited partnership interest.

As mentioned above, the parties agree, for purposes of this case, that the fair market value of the Hill House apartment complex on the date of death was $10,050,000. On the basis of the financial statements of Hill House for 1992 and the fair market value of the property as stipulated by the parties, Mr. Siwicki determined that the net asset value of Hill House on the date of the decedent's death was $10,332,769. Thus, the subject 25.235-percent interest in the net asset value of Hill House was

$2,607,474. By applying the discount of 51 percent identified in the case of IDS Balcor, Mr. Siwicki computed $1,277,662 as the value of the subject limited partnership interest using the net asset value approach (i.e., $2,607,474 x .49).

Mr. Siwicki combined the values he computed under the two approaches by weighting the capitalization approach by 75 percent and the net asset value approach by 25 percent. Mr. Siwicki felt a 3-to-1 ratio adequately emphasized the fact that the capitalization approach was the more important approach for this partnership interest. This resulted in a value of the subject limited partnership interest of $1,495,136.

Mr. Siwicki then applied a 35-percent discount to the above value to account for the lack of marketability of the subject limited partnership interest. He reviewed various market studies on illiquid securities to arrive at the amount of this discount. In particular, he relied on a study by the Securities and Exchange Commission (SEC) that compared sales between 1966 and 1969 of the restricted stock of companies that also had freely tradable, publicly traded counterparts.

After analyzing the various market studies on illiquid securities, Mr. Siwicki concluded that the lack of marketability discount for the subject limited partnership interest was most comparable to the portion of the SEC study that reported a 30-percent discount for restricted securities of nonreporting over-the-counter issuers. However, Mr. Siwicki believed the subject limited partnership interest warranted a greater discount due to two differences. First, he found that there was no prospect of a public market ever developing for this interest. Second, he found that the restrictions on the sale of this interest were perpetual, as opposed to the restrictions in the studies which lasted for only 1 to 3 years. Thus, Mr. Siwicki concluded a 35-percent discount represented the lack of marketability of the interest. After applying this discount, Mr. Siwicki concluded that the fair market value of the subject limited partnership interest on the date of death was $971,838.

Mr. Siwicki's analysis is summarized as follows:

| Petitioner's Expert | Capitalization Approach | | Net Asset Value Approach |
|---|---|---|---|
| Distributions during 1990 | $650,000.00 | Value of apartment complex | $10,050,000.00 |
| Distributions during 1991 | 600,000.00 | Other assets | 840,075.00 |
| Distributions during 1992 | 800,000.00 | Total liabilities | 557,306.00 |
| Total distributions | 2,050,000.00 | Net Asset Value of Hill House | 10,332,769.00 |
| Average annual distributions | 683,333.33 | | |
| Percentage interest | 0.25235 | Percentage interest | 0.25235 |
| Share of average annual distributions | 172,439.17 | Share of Net Asset Value | 2,607,474.26 |
| Percentage yield of IDS Balcor Income Properties | 0.11 | Less: Discount of 51% | 1,329,811.87 |
| Value of Hill House before marketability discount | 1,567,628.82 | Value of Hill House before marketability discount | 1,277,662.39 |
| Weight of capitalization approach | 0.75 | Weight of Net asset value approach | 0.25 |
| | 1,175,721.61 | | 319,415.60  $1,495,137.21 |
| Less: Marketability discount of 35% | | | 523,298.02 |
| Fair Market Value of the subject limited partnership interest | | | 971,839.19 |

The values computed by Mr. Siwicki are slightly different from the above values because of rounding.

Respondent's Expert

Respondent relies on the testimony and expert report of Dr. Samuel J. Kursh who is certified as a business appraiser by the Institute of Business Appraisers, Inc., and holds a doctorate in business administration from George Washington University.

Dr. Kursh valued the subject limited partnership interest using only the capitalization of income approach. According to Dr. Kursh, the net asset value approach is inappropriate for valuing the subject interest in Hill House because the partnership's underlying asset was income-producing real estate. Respondent argues that the net asset value is irrelevant because a hypothetical buyer could not control the sale of the underlying property or the liquidation of the partnership.

Dr. Kursh began his valuation by computing a discount rate. To do this, he selected comparables from the limited partnerships referenced in the May/June 1993 edition of "The Perspective". This is the same publication used by petitioner's expert but a later edition. Dr. Kursh

selected partnerships that owned real estate (residential and/or commercial), had low debt or leverage, had cash flows greater than their distributions and capital expenditures, and had assets that were valued by independent appraisers.  Dr. Kursh's criteria produced 16 comparables.  According to his report, investors in these 16 comparables "anticipated annual returns from cash distributions ranging from 9.31 percent to 11.58 percent." Dr. Kursh selected the midpoint of those yields, 10.45 percent, as the rate of return an investor would require for a minority interest investment in a limited partnership with the characteristics of the comparables.

Dr. Kursh then made three adjustments to the average yield of the comparables to take into account the particular characteristics of Hill House.  First, Dr. Kursh added 50 basis points to account for the fact that Hill House owned only one piece of property and thus lacked diversity, while the comparables owned multiple pieces of property.  Second, Dr. Kursh subtracted 100 basis points to account for the fact that the general partner of Hill House was also a limited partner.  According to Dr. Kursh, this commonality of interest would tend to ensure cash

distributions to the limited partners.  Again, this characteristic was not present in the comparables.  Lastly, Dr. Kursh subtracted 25 basis points to account for the fact that the data for the comparables might include distressed sales.  Dr. Kursh based this adjustment on the following editor's note in "The Perspective":

> Limited partnership investments are generally illiquid, long term investments. Sellers of such investments are often considered distressed for various reasons and find it necessary to accept discounted sales prices. As a result, the above price information may not reflect the intrinsic value of a limited partnership interest.

After making the above adjustments to the average yield, Dr. Kursh concluded that a potential purchaser would require an investment in Hill House to yield a rate of return of 9.7 percent (i.e., 10.45 + .50 - 1.00 - .25).

For an income stream, Dr. Kursh used the cash distributions made by Hill House in 1992, $800,000.  A 25.235-percent share of the 1992 cash distributions is approximately $202,000.  Because the only liability on the property was the mortgage that was due to be fully paid on April 1, 1993, Dr. Kursh believed that the partnership would realize a substantial increase in income after that

date.  Dr. Kursh reasoned that the aggregate distributions made during 1992 were at the minimum level of distributions that a potential buyer would anticipate.  Applying the discount rate of 9.7 percent to the decedent's 1992 distributions of $202,000, Dr. Kursh computed the value of the decedent's interest in Hill House of $2,082,474 (i.e., $202,000 ÷ 9.7 percent).

Dr. Kursh then applied a marketability discount.  In order to determine the amount of this discount, he used the Quantitative Marketability Discount Model (QMDM) that is described in a book written by Mr. Z. Christopher Mercer entitled Quantifying Marketability Discounts (1997).  The QMDM is an economic model that attempts to relate the present value of the future returns of an investment in the form of distributions and capital appreciation to the amount an investor is willing to pay for the investment.  The QMDM incorporates various factors, including:  The expected distribution yield (i.e., the expected annual return through distributions), the expected growth rate of value (i.e., the expected growth in the underlying asset value), the required holding period return (i.e., the rate of return on similar investments), and the assumed holding

period.  The QMDM consists of various summary tables in which implied marketability discounts are enumerated for each set of the above four factors.

As to this case, Dr. Kursh assumed the expected growth rate of value to be between 3 and 4 percent.  Dr. Kursh based this determination on the historical inflation rate.  He assumed the expected distribution yield to be 10 percent, based on the yields for comparable real estate investments.  He assumed a required holding period return of 16.4 percent.  This percentage was calculated using the rates of return on publicly traded securities as modified by specific characteristics of the particular investment.  And lastly, Dr. Kursh assumed a holding period of 10 to 15 years.  From the QMDM tables, Dr. Kursh's assumptions produced a marketability discount of 15 percent.

After applying the 15-percent marketability discount, Dr. Kursh concluded that the fair market value of the subject limited partnership interest on the date of death is $1,770,103.  Dr. Kursh's analysis is summarized as follows:

| Respondent's Expert | | Capitalization Approach |
|---|---|---|
| Distributions during 1992 | | $800,000.00 |
| Percentage interest | | 0.25235 |
| Share of distributions during 1992 | | 201,880.00 |
| Rounded | | 202,000.00 |
| Average yield of 16 comparables | 10.45% | |
| Plus:  Adjustment for lack of diversity | 0.50% | |
| Less:  Adjustment for commonality | -1.00% | |
| Less:  Adjustment for distressed sales | -0.25% | |
| Percentage yield | | 9.70 |
| Value of Hill House before marketability discount | | 2,082,474.23 |
| Less:  Marketability discount of 15% | | 312,371.13 |
| Fair market value of the subject limited partnership interest | | 1,770,103.10 |

## Analysis and Conclusions

As described above, both experts determined the fair market value of the subject limited partnership interest and then calculated and applied an appropriate discount to account for the diminished marketability of the interest. Strictly speaking, neither expert computed a minority discount. They both computed the fair market value of the subject limited partnership interest as a minority interest. Nevertheless, it is useful to compare the minority discounts that are implied in the experts' computations. It is also helpful to compare the combined discounts implied in their computations. The following schedule shows the values of the subject limited

partnership interest and the marketability discounts determined by the experts and the minority discounts and the combined discounts implied by the experts' computations:

|  | Petitioner's Expert | Respondent's Expert |
| --- | --- | --- |
| Net asset value of Hill House | $10,332,769.00 | $10,332,769.00 |
| 25.235-percent share | 2,607,474.26 | 2,607,474.26 |
| Minority discount percentage | 42.6596 | 20.1344 |
| FMV of the subject interest before marketability discount | 1,495,136.00 | 2,082,474.00 |
| Marketability discount percentage | 35.00 | 15.00 |
| FMV of the subject interest | 971,838.00 | 1,770,103.00 |
| Combined discount percentage | 62.7287 | 32.1143 |

As shown above, the computations of petitioner's expert imply a combined discount of 62.7287 percent and the computations of respondent's expert imply a combined discount of 32.1143 percent. We do not fully agree with either expert. Set out below is our view of some of the points about which the parties' experts disagree and our conclusion regarding the fair market value of the subject limited partnership interest.

First, we agree with petitioner's expert that it is appropriate to consider the fair market value of the

subject limited partnership interest as computed under both the net asset value and the capitalization approaches. We also agree with petitioner that a weighted average of 75 percent for the capitalization approach and 25 percent for the net asset value approach adequately reflects the attributes of this partnership.

In Estate of Andrews v. Commissioner, 79 T.C. 938 (1982), we considered the value of the decedent's stock in four closely held corporations, each of which was engaged principally in the ownership, operation, and management of commercial real estate properties. In valuing the decedent's 20-percent stock interest in each of the corporations, the parties differed over the weight to be given to earnings and to the net asset value of the corporations. The taxpayer argued that the corporations should be characterized as operating companies and greater weight should be placed on earnings and dividend-paying capacity than on net asset values. See id. at 944. The Commissioner argued, contrary to the Government's position in this case, that the corporations were in the nature of investment companies and would be valued by a hypothetical investor based upon a buyer's right to share in the value

of the corporation's underlying net assets.  See id. at

943.  For that reason, the Commissioner argued that the

corporations should not be valued using earnings and

dividend-paying capacity.  See id.  In resolving that

dispute, we stated as follows:

> [R]egardless of whether the corporation is seen
> as primarily an operating company, as opposed to
> an investment company, courts should not restrict
> consideration to only one approach to valuation,
> such as capitalization of earnings or net asset
> values.  * * * Certainly the degree to which the
> corporation is actively engaged in producing
> income rather than merely holding property for
> investment should influence the weight to be
> given to the values arrived at under the
> different approaches but it should not dictate
> the use of one approach to the exclusion of all
> others. [Id. at 945; citations omitted.]

In this case we do not agree with respondent that the

net asset value approach is irrelevant on the ground that a

hypothetical buyer of the subject limited partnership

interest would have no control over when the underlying

property was sold or when the partnership was liquidated.

The net asset value should still be considered because the

value of the underlying real estate will retain most of its

inherent value even if the corporation is not efficient in

securing a stream of rental income.  See id. at 944.  Thus,

weight must be given to the net asset value of the partnership's underlying assets even though a hypothetical buyer of the subject limited partnership interest would have no ability to directly realize the value by forcing liquidation.  See id. at 945.

Second, we agree with petitioner's expert that for purposes of computing the fair market value of the subject limited partnership interest under the capitalization of income approach, it is appropriate to use the average of the distributions made during the years 1990 through 1992, rather than the amount of the 1992 distribution.  As mentioned above, paragraph 4.1 of the partnership agreement grants the general partner sole discretion to determine when distributions are made.  While there is no guaranty that past distributions will reflect the distributions to be made in the future, we believe that an average of the distributions over 3 years better reflects the cash distributions that an investor could reasonably anticipate in the future, than the distributions made during 1992 of $800,000, an amount that exceeds the 3-year average by $116,667.  We do not agree with respondent's position that an investor would consider the 1992 distributions of

$800,000 to be the minimum future distributions because the final mortgage payment was to be made in April 1993.

Third, we agree with respondent's expert's use of 16 comparables. Respondent's expert selected 16 comparables and found the midpoint of the returns of those comparables, 10.45 percent. He made three adjustments and arrived at 9.7 percent as the return that an investor would require from Hill House. On the other hand, petitioner's expert in effect based the yield used in his computation on a single comparable. We believe that the use of a single comparable can be problematic, and we prefer the approach of respondent's expert in using a number of comparables. Cf. Estate of Hall v. Commissioner, 92 T.C. 312, 339-340 (1989).

As noted above, respondent's expert did not use the net asset value approach. Nevertheless, using the 16 comparables that respondent's expert selected, it appears that an investor would discount the net asset value of Hill House by 53.4 percent to arrive at the fair market value of the subject limited partnership interest under the net asset value approach. We computed this discount using a

method similar to the method used by Dr. Kursh in computing the rate of return of 10.45 percent used in his analysis.

Finally, we do not agree with the marketability discount computed by either expert. We disagree with the discount computed by Dr. Kursh on the basis of the QMDM model because slight variations in the assumptions used in the model produce dramatic differences in the results. For example, if the holding period for the investment were extended from 10 to 15 years, the period assumed by Dr. Kursh, to 15 to 20 years, and the required holding period return were increased to 20 percent from the return assumed by Dr. Kursh of between 16 to 18 percent, the QMDM table produces a 30-percent discount, twice the amount of the discount produced using Dr. Kursh's assumptions. Because the assumptions are not based on hard data and a range of data may be reasonable, we did not find the QMDM helpful in this case.

Similarly, we disagree with Mr. Siwicki's computation of a marketability discount. Mr. Siwicki arrived at an initial marketability discount, 30 percent, based upon his review of an SEC study of unregistered shares of nonreporting over-the-counter companies. He increased the

discount by 5 percent to reflect the perpetual restrictions on this interest and the slim prospect of the interest ever being publicly traded. We believe that Mr. Siwicki failed adequately to take into account certain characteristics of the subject limited partnership interest that suggest a decrease in the marketability discount. These factors include consistent dividends, the nature of the underlying assets, and a low degree of financial leverage.

Based on all the evidence of record, we find that a marketability discount of 20 percent should be applied to the subject limited partnership interest.

## Valuation

Based upon the entire record of this case, we find the date-of-death fair market value of the subject limited partnership interest is $1,309,650.64. Our analysis is summarized in the following schedule:

| Court's Analysis | | Capitalization | | Net Asset Value | |
|---|---|---|---|---|---|
| Distributions during 1990 | | $650,000.00 | Value of apartment complex | $10,050,000.00 | |
| Distributions during 1991 | | 600,000.00 | Other assets | 840,075.00 | |
| Distributions during 1992 | | 800,000.00 | Total liabilities | 557,306.00 | |
| Total distributions | | 2,050,000.00 | Net Asset Value of Hill House | 10,332,769.00 | |
| Average annual distributions | | 683,333.33 | | | |
| Percentage interest | | 0.25235 | Percentage interest | 0.25235 | |
| Share of average annual distributions | | 172,439.17 | Share of Net Asset Value | 2,607,474.26 | |
| Average yield of 16 comparables | 10.45% | | | | |
| Plus: Adjustment for lack of diversity | 0.50% | | | | |
| Less: Adjustment for commonality | -1.00% | | | | |
| Less: Adjustment for distressed sales | -.025% | | | 1,392,391.25 | |
| Percentage yield | | 9.70% | Less: Discount of 53.4% approach | | |
| Value of Hill House before marketability discount | | 1,777,723.40 | Value of Hill House before marketability discount | 1,215,083.01 | |
| Weight of capitalization approach | | 0.75% | Weight of net asset value approach | 0.25 | |
| Fair market value of the subject limited partnership interest | | 1,333,292.55 | | 303,770.75 | $1,637,063.30 |
| Less: Marketability discount of 20% | | | | | 327,412.66 |
| Fair market value of the subject limited partnership interest | | | | | 1,309,650.64 |

Based upon the foregoing, and concessions,

Decision will be entered

under Rule 155.