CONTRACT REPRODUCTION COMPANY, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Contract Reproduction Co. v. Commissioner
Docket Nos. 33128-83; 33226-83; 33227-83.
United States Tax Court
T.C. Memo 1987-476; 1987 Tax Ct. Memo LEXIS 472; 54 T.C.M. (CCH) 600; T.C.M. (RIA) 87476; September 21, 1987. Woodford G. Rowland, Robert E. Zang and Sean M. Rhatigan, for the petitioners. David L. Lau, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: In these consolidated cases, respondent determined deficiencies *473 in petitioners' Federal income tax as follows: Alleged Understated
Taxable
or Mischaracterized
Petitioner(s)
Year Ended
Income
Deficiency
Contract Reproduction Co., Inc.
1978
$ 72,000
$ 35,208
1979
78,000  35,300  Dale K. and Karol A. Clark
1978
36,000  1,860   1979
48,000  3,762   Ronald H. and Phyllis C. Bell
1978
39,000  1,859   1979
39,000  3,548   After a concession, [2] the issue for decision is whether the amounts paid by Contract Reproduction, Inc., to its two officer-shareholders, Dale K. Clark and Ronald H. Bell, during the taxable years ending in 1978 and 1979 constitute reasonable compensation within the meaning of section 162(a)(1). [3]
*474 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by reference. Petitioner, Contract Reproduction Company, Inc. (hereinafter referred to as the corporation) is organized under the laws of California. The corporation was located in San Francisco, California, at the time the petition was filed. During the taxable years in issue, the corporation, an accrual basis taxpayer, was engaged in the manufacture and printing of stationery, letterhead and promotional and advertising materials. On its corporate income tax returns for fiscal years ending April 30, 1978 and April 30, 1979, the corporation claimed deductions in the amount of $ 274,892 and $ 331,480 respectively, for compensation paid to officers under section 162. The corporation also claimed deductions in the amounts of $ 124.990 and $ 154,187 respectively, for contributions to its defined benefit pension plan. Petitioners Ronald H. and Phyllis C. Bell (hereinafter referred to as Bell or the Bells) resided in Tiburon, California, at the time they filed their petition. The Bells, cash basis taxpayer, *475 filed joint income tax returns for the calendar years 1978 and 1979. They claimed the benefit of the maximum tax on earned income under section 1348 for all amounts received as compensation from the corporation. Petitioners Dale K. and Karol A. Clark (hereinafter referred to as Clark or the Clarks) resided in San Mateo, California, at the time of filing their petition. The Clarks, cash basis taxpayers, filed joint income tax returns in 1978 and 1979, claiming the benefits of the maximum tax on earned income for all reported compensation received from the corporation. Clark and Bell were the only shareholders of the corporation, each owning one-half of the issued stock. The Board of Directors of the corporation was comprised of the Clarks and the Bells. Since its organization in January of 1966, Bell has served as the president and Clark has served as secretary and treasurer. Bell was born in Seattle, Washington. Bell joined the Navy after completing high school and then moved to San Francisco where he worked for a printing company named Haloid. Bell worked as a service and training representative and gradually learned the printing and lithography business. Because Bell *476 wanted to work in sales, he left Haloid and joined Addressograph-Multigraph Company, another San Francisco printing company. He was employed there for seven years, training customers in the use of offset printing presses and selling printing services and equipment. Over the years his duties and responsibilities with the company increased. He was a successful salesman, often selling over quota. Bell decided to leave Addressograph-Multigraph when he realized that he could not be promoted without leaving the San Francisco area. Clark's career history followed a similar pattern. Born in Parsons, Kansas, Clark graduated from the University of Washington, where he majored in economics. He served in the Army during the Korean War. After leaving the service he joined Addressograph-Multigraph Company where he met Bell. He too was a successful salesman, selling over quota for four out of five years. Realizing that there were no promotion opportunities within the San Francisco area, he left the company to join Bell. In 1963, the pair formed a partnership. In January 1966, Clark and Bell incorporated the partnership, each contributing $ 3,000 to capital. Since that date, there *477 have been no contributions to capital. The corporation started out in black and white printing aiming for high volume and low production costs. In response to the unionization of the production staff and the comparatively high costs of a downtown San Francisco location, the corporation abandoned simple black and white printing in favor of color printing. They bought a high-quality, large Heidelberg printing press and became proficient at multi-color printing. The corporation soon found a niche in the area's printing industry. This was accomplished in two ways: the corporation handled more difficult jobs at a lower price than its competitors and was very attentive to details insuring customer satisfaction. The corporation specialized in complicated multi-color printing. The chief products, advertising brochures and fine quality pamphlets, were among the industry's most technically difficult to produce. These products required high level technological capacity and great expertise and creativity. The corporation frequently competed with much larger companies by handling technically difficult jobs with a relatively small staff and less equipment. The corporation also emphasized *478 customer satisfaction. By 1978, five or six clients comprised more than 90 percent of the corporation's total sales volume. The corporation's clientele included the State Bar of California, Fireman's Fund Insurance Company, Bank of America and the California Dental Service. The bulk of the corporation's business came from word of mouth advertising by happy customers and repeat business. Recognizing the importance of customer relations, the sales personnel provided attentive follow-up and support service. Although it was costly for the corporation to redo a job for a disgruntled customer, it was standard procedure. The corporation's success was attributable to the hard work and expertise of its officers. Clark and Bell were primarily responsible for cultivating and maintaining the sales accounts, although the corporation employed other salespeople from time to time. Although Clark and Bell each maintained separate sales accounts, they were aware of each other's activities so that they could step in and "cover" for each other if necessary. They each worked long hours, generally in sales. Because their reputation was their strongest asset, Clark and Bell handled every facet *479 of the accounts from order to follow-up calls. They performed all the management functions except for the strictly routine decisions. Generally, Bell supervised production, occasionally running the machinery for demanding jobs. Clark supervised the financial affairs and bookkeeping. Together they supervised the employees and made personnel decisions. They each made job estimates, relying on their extensive knowledge of the field. Together they updated their pricing lists, managed purchasing and constantly monitored quality control. [4]
*480 The corporation, from inception to the years involved in this case, was a very successful endeavor. Gross profit on sales for the fiscal years ending in April 1978 and April 1979 were $ 632,054 and $ 714,763, respectively. The ratio of gross profits to gross sales for 1978 was 54.07 percent and for 1979 it was 54.29 percent. The corporation's sales, costs of goods sold, gross profits on sales, and taxable income for taxable years 1976 to 1979 were as follows: Cost of
Gross
Gross
Goods
Profit
Other
Taxable
Year
Sales
Sold
on Sales
Income
Income
4/30/76
$ 640,000
$ 344,511
$ 295,592
$ 5,849
$ 34,511 4/30/77
832,031
433,134  398,897  2,685
( 2,614)
4/30/78
1,168,863
536,809  632,054  2,557
51,079 4/30/79
1,316,444
601,681  714,763  7,708
53,872 Although no further capital was contributed after the initial capitalization ($ 6,000), the corporation had retained earnings in the amount of $ 184,583 in 1978 and $ 225,547 in 1979. [5]The corporation declined a dividend once, several years before the years in issue. [6]
*481 The corporation paid most of its employees on a bonus system. For example, the production employees were paid union wage with a bonus tied to job performance. The office manager, whose duties included customer relations, received a bonus in addition to his salary. The corporation had a production manager who was also paid according to an incentive program. The bonuses paid to the office manager and the production manager were computed as a percentage of monthly net profits. Most of the clerical personnel received a straight salary. Because Clark and Bell considered themselves salesmen and were accustomed to receiving the bulk of their pay in bonus or commission form, they were paid under a salary/bonus combination scheme. Clark and Bell received salaries in the amount of $ 66,000 each in 1978. In 1978 Clark received a salary of $ 78,000 and Bell received a salary of $ 89,190. In addition, they each received two different types of bonuses. One type of bonus was a formula bonus, a preset percentage of profits authorized by the Board of Directors in 1976 and set at a percentage of sales. The formula bonus was set as follows: 2.5% of sales up to $ 500,000 2.75% of sales *482 up to $ 750,000 3.0% of sale up to $ 1,000,000 5.0% of sales up to $ 1,500,000 10.0% of sales above $ 1,500,001
In 1978, Clark and Bell each received a formula bonus in the amount of $ 35,446. In 1979, they each received $ 43,145. [7]
In addition to the formula bonuses, Clark and Bell received bonuses when the cash was available and extra services were performed. These bonuses were authorized by the Board of Directors as a reward and as an incentive for continued good service. For example, when Bell redesigned the procedures in the camera department, achieving a higher profit margin on a particularly complicated order, he was allocated a special bonus that year. Early in the history of the corporation, bonuses were occasionally authorized at the beginning of the fiscal year but never paid due to insufficient profits at the end of the year. Additional bonuses were authorized but not paid in 1976 and 1977. In 1978 and 1979 these bonuses were authorized and paid. For the calendar years 1978 and 1979, Clark and Bell's nondeferred *483 compensation was as follows: Year
Salary
Formula Bonus
Other Bonuses
Clark
Bell
Clark
Bell
Clark
Bell
1978
$ 66,000
$ 66,000
$ 35,446
$ 35,446
$ 33,000
$ 39,000
1979
78,000
89,190
43,145
43,145
48,000
30,000
In 1978 Clark received nondeferred compensation in the amount of $ 134,443 while Bell's nondeferred compensation totaled $ 140,446. In 1979 the amount were $ 169,145 for Clark and $ 162,335 for Bell. The corporation had a qualified defined benefit pension plan in addition to a profit sharing plan during the taxable years herein. During the years in issue, Clark and Bell were fully vested and by the end of 1979 three other employees were also vested. [8] In 1978, contributions to the plan totaled $ 124,990, of which $ 113,248 represented contributions to officers' accounts and $ 11,742 was for non-officer employees. In 1979 the plan received $ 154,187, with $ 139,083 dedicated to the officers and $ 15,104 for the benefit of the other employees. The contributions attributed to Clark and *484 Bell were: 1978
1979
Bell
$ 57,742
$ 64,881
Clark
55,506
74,202
Thus, total deferred and nondeferred compensation in 1978 was $ 189,952 for Clark and $ 198,188 for Bell. In 1979 Clark received total compensation in the amount of $ 243,347 while Bell received $ 227,216. Respondent issued a notice of deficiency to the corporation wherein he disallowed the business expense deduction attributable to compensation paid to the officers during the years 1978 and 1979 in the amounts of $ 72,000 and $ 78,000, respectively. The notice of deficiency alleged that the payments were unreasonable compensation or alternatively, distributions in respect to stock. Respondent also issued notices of deficiency to the Clarks and to the Bells. In these notices respondent alleged that the excess compensation had been erroneously included as personal service earned income in their respective returns. Specifically, respondent determined that the Bells had overstated personal service income in the amount of $ 39,000 for each year in issue. Similarly, respondent determined an overstatement of personal service income with respect to the Clarks in the amount of $ 36,000 in *485 1978 and in the amount of $ 48,000 in 1979. [9]
OPINION The principal issue for decision is whether the amounts paid in 1978 and 1979 by the corporation to Clark and Bell are deductible under section 162(a) as reasonable compensation for services rendered. If we hold that the section 162(a) deduction was proper then it necessarily follows that the individual petitioners may treat such amounts as personal service income within the meaning of section 1348. [10]
*486 Section 162(a)(1) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business including a "reasonable allowance for salaries or other compensation for personal services actually rendered." Section 1.162-7(a), Income Tax Regs., requires that the compensation be reasonable in amount and that the payment be for services rendered. [11] The regulations go on to explain that a reasonable amount is one which would result from an arm's-length bargain between employer and employee. Furthermore, reasonable compensation is limited to the amount that would ordinarily be paid by an enterprise under like circumstances. Sec. 1.16207(b), Income Tax Regs.
*487 In the instant case, respondent contends that the compensation paid by the corporation to its officer-shareholders in 1978 and 1979 was excessive and unreasonable. In the alternative, respondent contends that even if reasonable in amount, the compensation payments constituted disguised distributions of earnings and profits with respect to stock. Petitioners take the position that the compensation paid in 1978 and 1979 was both reasonable in amount and in exchange solely for services. They argue that as payment for services, the compensation payments were not disguised dividends. The issue of reasonable compensation is a factual question and must be decided on the basis of all the facts in each particular case. Home Interiors & Gift, Inc. v. Commissioner,73 T.C. 1142 (1980); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564 (1974), affd. 528 F.2d 176 (10th Cir. 1975). Respondent's determination is presumptively correct and petitioners bear the burden of proving the reasonableness of the compensation. Botany Worsted Mills v. United States,278 U.S. 282 (1929); *488 Rule 142(a). Where controlling officer-shareholders set the levels of compensation that they will receive as employees, as in the case before us, we must use close scrutiny to determine whether the purported compensation is a disguised dividend. Trinity Quarries, Inc. v. United States,679 F.2d 205 (11th Cir. 1982); Nor-Cal Adjusters v. Commissioner,503 F.2d 359 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694 (1977). Many factors are relevant in determining whether compensation is reasonable and no single factor is dispositive. [12] As this case is appealable to the Ninth Circuit we are required to follow that court's applicable law. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In Elliotts, Inc. v. Commissioner,716 F.2d 1241 (9th Cir. 1983), revg. and remanding a Memorandum Opinion of this Court, the court of appeals articulated an analytical *489 structure for this inquiry. Specifically, the Ninth Circuit used a facts and circumstances test which was comprised of five broad categories of inquiry. Accordingly, we have for purposes of our analysis used similar criteria and organizational framework. Role in Company
The first category among these factors is the role of the employee in the company. Particularly important under this inquiry is whether the company's success was attributable in part or in whole to the efforts and talents of the employee. American Foundry v. Commissioner,536 F.2d 289 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972). Based on the record, it is apparent that Clark and Bell were indispensible to the corporation. They made all the policy and managerial decisions. Most of the sales were the direct result of their salesmanship and expertise. It *490 was their fine reputation, business acumen, technical expertise and attention to customers' needs and desires which, coupled with the long hours of work and dedication to the business, caused the success the corporation enjoyed. See Home Interiors & Gifts, Inc. v. Commissioner, supra.
External Comparison
The second consideration is a comparison of the financial well-being of the corporation with the industry as a whole. This includes a comparison of the employee's salary with those paid by similar companies for similar services. Evidence introduced to show industry comparables is relevant, but not conclusive. Moreover, the failure to show an exact industry comparable is not in itself dispositive. Home Interiors & Gifts, Inc. v. Commissioner, supra.Here, because of the complicated nature of the products in which the corporation specialized, it competed with printing companies of a much larger size. If measured solely according to the size of the production and clerical staffs, the corporation in the instant case would be measured against printing companies which lack similar technological skill and equipment. Therefore, in this analysis *491 we recognize that it will be impossible to make exact comparisons. [13]
With respect to industry comparables, petitioners introduced expert testimony at trial. Respondent did not. Opinion testimony of an expert is admissible if, and because, it will assist the trier of fact to understand evidence that will determine a fact in issue. See rule 702 of Federal Rules of Evidence. Such evidence must be weighed in light of the demonstrated qualifications of the expert and all other relevant evidence of value. Estate of Christ v. Commissioner,480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness *492 when that opinion is contrary to our own judgment. Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court; Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever, in our best judgment is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Although we are inclined toward accepting the more persuasive, and in this case, sole expert opinion, we are not required to accord such testimony total acceptance. Parker v. Commissioner,86 T.C. 547, 562 (1986). Petitioners' expert witness, Robert A. McCaskill (McCaskill), is a certified public accountant in California with a masters in business administration from Stanford University Graduate School of Business. His special area of expertise is executive compensation. He testified as to the findings made in his report, which he prepared in anticipation of this litigation and which was based *493 upon his analysis of several studies and reports. [14]
McCaskill testified that the compensation paid to Clark and Bell was not excessive when compared to companies of similar size and profitability. McCaskill also stated that incentive compensation for executives was routine in the printing industry and that the bonuses received by Clark and Bell were reasonable. He noted that within the printing industry bonuses often outweigh salary in the total compensation composite. McCaskill determined that the corporation was highly successful in comparison with the industry in general. He found *494 that both the gross profit ratio and the return on investment were twice the industry average for the years in issue. Similarly, he found the gross profit per employee to be four times the industry average for the same year. McCaskill emphasized that the corporation's sales had increased 400 percent in the ten years between 1969 and 1979. On brief, respondent challenged the methods McCaskill used to compute the figures for comparison. In particular, respondent challenged McCaskill's finding that the return on investment was twice the industry average. [15] McCaskill testified that although there were various ways to compute return on investment, he had used the same method as the Printing Industry of America study (hereinafter referred to as the PIA study). *495 We are free to embrace the opinion testimony of an expert witness whose testimony is based clearly on fact. On one side we consider McCaskill's professional qualifications and knowledgeable demeanor. On the other hand we have respondent's brief containing a barrage of formulas and assertions as to how certain figures should be computed. We find it significant that respondent's cross-examination of McCaskill failed to illuminate the areas of dispute and respondent did not introduce an expert witness of his own. Therefore, in light of McCaskill's superior qualifications and credible testimony, we find that the figures he provided are useful for purposes of comparing the corporation with the printing industry and with one exception, noted below, we will give credence to them. We have also considered two surveys introduced into evidence: the PIA study and the Research Institute of America survey of executive compensation (hereinafter referred to as RIA). The PIA study figures are not an exact template because the corporation is a relatively small company for the magnitude of its sales. Furthermore, the study is representative of the printing industry nationwide and thus does not *496 reflect peculiarities of the San Francisco market. The PIA study categorizes printing companies by gross sales, thus placing the corporation in the $ 500,000 to $ 1,500,000 category. Within that category, figures are divided into "profit leaders" and "all firms." A profit leader's net income before taxes is 8 percent or more of gross sales. [16]
Among the firms sampled in the PIA study the gross profits as a percentage of sales were 23.96 percent for "all firms" and 28.79 percent for "profit leaders." The percentage for the corporation was 54.07 percent in 1978, and 54.29 percent in 1979, approximately double the sampled firms. The PIA study also provided figures for the return on investment which is computed *497 after subtracting expenses, including executive salaries, and represents the change in the value of the equity. Return on investment was 7.77 percent for "all firms" and 18.92 percent for "profit leaders." Return on investment for the corporation was calculated by McCaskill to be 25.45 percent in 1978 and 19.96 percent in 1979. Finally, the PIA study found that "profit leaders" paid 2.89 percent of gross sales in executive compensation while "all firms" paid 3.29 percent. In this case the corporation paid 23.5 percent and 25.17 percent of gross sales in executive compensation for the years 1978 and 1979, respectively. This study, despite its inexactitude, establishes that the corporation was highly successful and that Clark and Bell were well paid. The RIA survey organized businesses into seven broad industry groups. The printing and publishing category includes many companies which are far larger and more profitable than the corporation herein. Therefore the information contained in the RIA survey is relevant but not conclusive. The RIA survey indicated that 10 percent of the top executives reporting earned more than $ 131,000 per year while median compensation was $ 75,000. *498 Clark's total compensation was $ 189,952 in 1978 and $ 243,347 in 1979, while Bell received compensation in the amount of $ 198,188 in 1978 and $ 227,216 in 1979. [17] Of the executives in the RIA survey whose income rose in 1978, 10 percent reported an increase of more than 36 percent while the average increase was 19 percent. Clark's nondeferred compensation increased 47.2 percent from 1977 to 1978 and 20.5 percent from 1978 to 1979. Bell's nondeferred compensation rose 45.2 percent in 1978 and 13.5 percent in 1979. [18] Of the printing businesses which paid their executives more in 1978 than in 1977, the top 10 percent reported an increase of 139 percent with an industry median of 30 percent. In this light, Clark's increase of 47.2 percent and Bell's increase of 45.2 percent are within the range between highest and lowest. *499 Both Clark and Bell performed many functions for the corporation. In addition to managerial and supervisory responsibilities, both Clark and Bell were full-time sales persons. Furthermore, Clark was responsible for the bookkeeping, financial affairs and corporate bookkeeping while Bell was in charge of the production staff and equipment. When an employee performs more than one job it is appropriate to pay him for all of the tasks performed. Elliotts, Inc. v. Commissioner, supra at 1246. Thus, based on the RIA study it is our opinion that the salaries paid by the corporation were not disproportionate in comparison to other executive compensation amounts. In sum, with respect to comparables for executive compensation, we accord greater weight to the RIA study than to the PIA study because the RIA study is primarily concerned with executive compensation as opposed to gross sales and return on investment.
Character and Condition of Company.
The third factor concerns the character and condition of a company. This includes the company's size as indicated by its sales, net income or capital income, the complexities of the business and the prevailing *500 economic conditions. Elliotts, Inc. v. Commissioner, supra at 1246. While the general economic condition of the San Francisco area printing industry for the relevant years cannot be apprised from the record, [19] the corporation's proficiency in handling complex printing jobs, despite its small size in comparison to other companies performing similar jobs, contributed to its success. By performing jobs quickly and well, it found an unusual and highly profitable niche in the San Francisco printing industry. Conflict of Interest
The fourth factor is whether there was a conflict of interest between the company and the employees. To determine this the Ninth Circuit looks for the existence of an arm's-length bargain and whether a hypothetical independent investor would consider the compensation reasonable. Under the first prong of the inquiry it is unlikely that Clark and Bell could establish that they had an arm's-length bargain with the corporation. *501 Clearly, there is little point for a controlling shareholder to attempt to characterize his relationship with the corporation as disinterested. Even an arrangement which appears fair and equal would be suspect if it arises between an employee and the corporation he controls. [20]
Under the arm's-length inquiry a corporation's dividend history is another investigative criterion. Pacific Grains, Inc. v. Commissioner,399 F.2d 603 (9th Cir. 1968), affg. a Memorandum Opinion of this Court. For all practical purposes the corporation in this case has never paid dividends.[21] The mere existence of a potentially exploitable relationship, however, when coupled with the absence of dividend distributions, *502 does not necessarily lead to the conclusion that the amount of compensation is unreasonably high. Elliotts, Inc. v. Commissioner, supra at 1247. Because it is impossible for Clark and Bell to demonstrate that their salary was the result of an arm's-length bargain, the inquiry turns next to the second prong of the analysis, the question of the hypothetical independent investor. The Ninth Circuit explained the hypothetical independent investor analysis in the following way: If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement. If, however, that is not the case and the company's earnings on equity remain at a level *503 that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. [Footnote references omitted.]
Elliotts, Inc. v. Commissioner, supra at 1247. Thus, a hypothetical investor would not be troubled by a corporation's failure to pay dividends where there is an increase in the net worth of the corporation. In the instant case retained earnings and profits have consistently been recycled back into the corporation to fuel business expansion. McCaskill testified that the return on investment was a healthy 25.45 percent in 1978 and 19.96 percent in 1979, substantially higher than the industry average of 7.77 percent. Because the corporation was profitable and producing an enviable return on investment for its shareholders, a hypothetical shareholder would have no complaints about the salaries paid to Clark and Bell, particularly because the success of the corporation and the continued growth in the company's earnings on equity were attributable to the efforts of these two officers. Although the corporation could easily have *504 been exploited by Clark and Bell, there is no indication that it was, nor is there an reason to believe that profits were being exclusively paid out by the corporation in the form of salary and bonuses.
Internal Consistency
The fifth and final factor under the Elliotts, Inc. Analysis looks to the internal compensation schedule of the corporation. Under this criterion the payment schedule ought to be related exclusively to the performance of services by the employee. Bonuses are to be strenuously scrutinized although there is nothing inherently suspect about incentive oriented payment schedules. Mayson Mfg. Co. v. Commissioner,178 F.2d 115 (6th Cir. 1949). Bonuses which are consistently designated in amounts which reflect the percentage of the recipient's stock holdings, however, are suspect. Elliotts, Inc. v. Commissioner, supra at 1241. The bonus schedule should be predetermined and authorized by the Board of Directors. The bonus should not be decided after perusing the year's profits. Nor-Cal Adjusters, Inc. v. Commissioner, supra.In the instant case, the bonuses were not equal although Clark and Bell were *505 equal shareholders. Bonuses were set by the Board of Directors about half-way through the year. The bonuses were awarded on the basis of extra services performed to compensate Clark and Bell for the extra individual efforts and duties undertaken which enabled the corporation to prosper. Finally, in determining whether the salary paid to a particular employee is reasonable, salaries paid to other employees by the corporation are relevant. Home Interiors & Gifts, Inc. v. Commissioner, supra at 1159. [22] In the instant case, Clark and Bell performed the vast majority of services and actively supervised every aspect of the corporation's business. The less strenuous and less extensive duties of the other employees are not comparable.[23] It its appropriate to pay one individual more when he performs several jobs. Elliotts, Inc. v. Commissioner, supra at 1246; Hammond Lead Products, Inc. v. Commissioner,425 F.2d 31 (7th Cir. 1970), affg. a Memorandum Opinion of this Court. *506 Accordingly, after very careful analysis of all the facts and circumstances are careful weighing of those circumstances, we hold that the payments made to Clark and Bell as salary and bonuses constituted reasonable compensation within the meaning of section 162(a), and not disguised dividends. Therefore, the amounts are deductible to the corporation under section 162 as payments made for compensation and correspondingly, the individual petitioners are entitled to treat such compensation as personal service income within the meaning of section 1348. To reflect the concession by the corporation, as well as the foregoing, Decision in docket No. 33128-83 will be entered under Rule 155.
Decisions in docket Nos. 33226-83 and 33227-83 will be entered for the petitioners.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Ronald H. and Phyllis C. Bell, docket No. 33226-83; and Dale K. Clark and Karol A. Clark, docket No. 33227-83. ↩
2. Petitioner Contract Reproduction Co., Inc., acknowledged that amounts deducted as selling expenses for the year ended April 30, 1978 included $ 1,600 in gifts paid to employees. Pursuant to section 274 of the Internal Revenue Code↩, respondent disallowed $ 1,350 of that amount and petitioners conceded that adjustment. 3. All section references herein are to the Internal Revenue Code of 1954, as amended and in effect during the tax years in issue, and all Rule references, unless otherwise noted, are to the Tax Court Rules of Practice and Procedure. ↩
4. For three years Clark and Bell participated in another printing business, Dart Printing (hereinafter referred to as Dart). Dart's business was simple black and white printing, generally producing business forms and federal tax forms. Neither Clark nor Bell contributed considerable time or effect to Dart printing. After determining, that the business was not very profitable Clark and Bell withdrew, terminating the partnership in 1979 or 1980. Clark and Bell were also equal partners in CBC Partnership (hereinafter referred to as the partnership). The partnership owned the equipment used in the corporation's printing business. The corporation rented the equipment from the partnership. In addition, the partnership owned a summer house used equally by the Clarks and the Bells, as well as some other real estate interests. ↩
5. The capital account, retained earnings and dividend history of the corporation is as follows: ↩
Beginning
Ending
Tax
Capital
Dividends
Retained
Retained
Year
Account
Paid
Earnings
Earnings
4/30/76
$ 6,000
-0-
$ 115,232
$ 139,956
4/30/77
6,000  -0-
139,956
143,178
4/30/78
6,000  -0-
143,178
184,583
4/30/79
6,000  -0-
184,583
225,547
6. In 1973 the corporate return was audited and petitioners then conceded that the authorization for a bonus payment had been mistakenly omitted from the corporate minutes. The payment was recharacterized as a dividend. ↩
7. We cannot determine how these figures are derived using the formulas but the parties stipulated that these were the amounts received. ↩
8. The production employees were not covered by the plan because they had an adequate plan under the union contract. ↩
9. Respondent gave no explanation as to how these figures were computed. The sum of the adjustments determined against Clark and Bell for 1978 ($ 75,000) exceeds the amount of the adjustment determined against the corporation for that year ($ 72,000). In 1979, Clark and Bell had determined adjustments of $ 87,000 while the corporation's adjustment in 1979 was determined to be $ 78,000. ↩
10. Personal service income as used in section 1348(b)(1) means "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits," as defined in section 911(b)↩. 11. Due to the subjective nature of determining whether compensation was paid purely for services, courts generally focus only on the reasonableness prong (see, e.g., Pacific Grains, Inc. v. Commissioner,399 F.2d 603 (9th Cir. 1968)), affd. a Memorandum Opinion of this Court, unless the Commissioner presents evidence that the payments were disguised dividends (see, e.g., Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 348-349 (1957), affd. 261 F.2d 842 (9th Cir. 1958)). See Elliotts, Inc. v. Commissioner,716 F.2d 1241 (9th Cir. 1983), revg. and remanding a Memorandum Opinion of this Court (court will not presume an element of disguised dividend from the bare fact that a profitable corporation does not pay dividends). See also Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971). 12. For a comprehensive list of the factors frequently used to determine reasonable compensation, see Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567-568 (1974), quoting Mayson Mfg. Co. v. Commissioner,178 F.2d 115↩ (6th Cir. 1949).
13. Too great an emphasis on industry comparables would be a mistake if the comparables are meaningless. Giles Industries, Inc. v. United States,496 F.2d 556, 564 (Ct. Cl. 1974). Furthermore, industry comparables are at best a useful tool for analysis and are not dispositive. Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142↩ (1980). 14. In preparing his report, McCaskill relied upon the 1979 Executive Commission Survey by the Research Institute of America, the 1980 Executive Compensation Survey by the Research Institute of America, the Top 100 Compensation Study 1979 by Towers, Perrin, Forster and Crosby (hereinafter referred to as TPF&C), the 1980 Executive Compensation Study 500 Largest Industrials, the Top and Bottom by TPF&C, the 1978 Ratio Study Sales Volume Study by Printing Industries of America (PIA), and the Executive Compensation Service Top Management Report 1978/1979 by American Management Association. ↩
15. Respondent claims that when he calculated return on investment figures for the corporation, also using the PIA report methods, his calculations result in a lower figure. Neither petitioners nor respondent, however, set forth any information explaining how the PIA study made calculations so we cannot compare. Respondent charged that depreciation should be subtracted from gross plant and machinery in the denominator of the return of investment ratio but included in gross plant and machinery in the numerator. McCaskill included depreciation in both the denominator and the numerator. ↩
16. Petitioners failed to adequately support their contention that the corporation should be classified as a profit leader, using this particular standard because, using the corporation's income before taxes as computed for tax purposes, the ratio is closer to 4 percent than to 8 percent. Respondent maintained that the corporation was not a profit leader within the definition of the PIA study, but based on the evidence presented we are unable to make this determination. ↩
17. Compensation includes amounts contributed to pension plans for the benefit of the employees. Leonard J. Ruck, Inc. v. Commissioner,T.C. Memo. 1969-16↩. 18. The increase from 1977 to 1978 is partly due to a 70 percent increase in the formula bonus payments as well as additional bonus payments. There was some indication that the 1978 and 1979 bonuses compensated for the earlier failure to pay bonuses in 1976 and 1977, although this was not clearly stated. ↩
19. There was evidence of trouble in the printing industry both prior to and subsequent to the years in issue. An inference can be drawn that the difficulties continued throughout the years in issue as well.↩
20. The factor of control cuts both ways. A controlling shareholder is in a good position to award himself an unreasonably large salary. Conversely, the fact that the employee is also the owner might cause him to forego reasonable compensation during lean years, putting the needs and welfare of the business first. See Allison Corp. v. Commissioner,T.C. Memo. 1977-166, Skyland Oldsmobile, Inc. v. Commissioner,T.C. Memo. 1972-17↩. 21. The dividend paid by the corporation in 1963 is not a factor because it arose out of an earlier examination by respondent wherein the corporation conceded that a bonus payment should be characterized as a dividend due to the absence of approval in the corporate minutes. ↩
22. See Kipnis v. Commissioner,T.C. Memo. 1982-471; Ken Miller Supply, Inc. v. Commissioner,T.C. Memo. 1978-228↩. 23. However, we do note that bonuses were paid only to the officer-shareholders, but also to the other employees at the company. This is a relevant factor in determining whether the bonuses in issue were dividend distributions rather than payment for services actually rendered. See Nor-Cal Adjusters, Inc. v. Commissioner,503 F.2d 359↩ (9th Cir. 1974), affg. a Memorandum Opinion of this Court.