T.C. Memo. 1998-308

UNITED STATES TAX COURT

ESTATE OF ALBERT FRATINI, DECEASED, MARION FRIEDEBERG, PERSONAL
REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE,
Respondent

Docket No. 18921-96.                    Filed August 24, 1998.

Nickolas P. Tooliatos II, for petitioner.

Allan D. Hill, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  Respondent determined a deficiency of $443,960
in petitioner's Federal estate tax.  After concessions, the
issues remaining for decision are:  (1) To what extent, if any,
did Ms. Friedeberg contribute toward the purchase of various real
properties, bank accounts, and certificates of deposit that were

held in the joint name of decedent and Ms. Friedeberg on the date of decedent's death; (2) whether decedent's estate is entitled to reduce the amount required to be included under section 2040[1] by claimed fractional interest discounts applied to decedent's interest in parcels of real property owned in joint tenancy with Ms. Friedeberg on his date of death; and (3) whether pursuant to section 2053, the estate is entitled to a deduction for more than 50 percent of the mortgage debt outstanding on jointly owned real properties includable in the estate.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation of facts are incorporated herein by this reference.

Albert Fratini (decedent), who was a resident of San Francisco, California, died on June 2, 1992. Decedent was not married when he died. For 18 years preceding his death, decedent continuously lived with Marion Friedeberg. Ms. Friedeberg is the estate's personal representative and the sole beneficiary under decedent's holographic will. At the time she filed the petition herein, Ms. Friedeberg resided in San Francisco, California.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Before beginning his relationship with Ms. Friedeberg, decedent was married to Ms. Annemarie Fratini. Decedent and Ms. Fratini were married on January 2, 1962. They separated on June 4, 1974, and their marriage was terminated by a final judgment of dissolution in the Superior Court of San Francisco County, California, dated March 8, 1978.

Ms. Friedeberg was born on April 7, 1933, in Berlin, Germany. Between 1943 and 1946, Ms. Friedeberg spent 2-1/2 years in a concentration camp during World War II. She moved to the United States in 1947 and attended school until the 11th grade. Upon leaving school, Ms. Friedeberg became employed as a filing clerk until 1950.

From August 26, 1951, to August 26, 1976, Ms. Friedeberg was married to Mr. Werner Friedeberg. They separated on June 2, 1974, and their marriage was terminated on August 26, 1976, pursuant to a final judgment of dissolution in the Superior Court of San Francisco County, California. Mutual friends introduced decedent and his wife to Ms. Friedeberg and her husband in 1970. From 1970 to 1974, the couples maintained a casual friendship. In June 1974, both couples separated and decedent and Ms. Friedeberg began living together.

At the time that decedent and Ms. Friedeberg began living together, decedent was employed as a project engineer for Metal Tile Co. Although decedent and Ms. Friedeberg lived in San

Francisco, decedent traveled to and worked in Los Angeles 3 to 4 days a week.

At the time decedent and Ms. Friedeberg began their relationship in 1974, decedent owned, among other things, several pieces of real property.  From 1958 until his death, decedent owned a parcel of real property located at 517 Laidley Street (Laidley), San Francisco, California.  The Laidley property was purchased for $12,000.  On March 18, 1977, Ms. Fratini transferred her interest in Laidley to decedent by quitclaim deed.  On December 11, 1987, decedent transferred to Ms. Friedeberg an undivided one-half joint tenancy interest in Laidley.  The parties agree that the fair market value of Laidley on the date of decedent's death was $275,000.

From 1967 until his death, decedent owned a parcel of real property, including a building thereon, located at 3605 Valencia Street (Valencia), San Francisco, California.  The building had 20 apartments and 6 commercial spaces.  In 1971, decedent acquired an adjacent lot for parking.  Hereinafter, we shall refer to the building and parking lot as Valencia.  The purchase prices of the building and the parking lot were $185,108 and $6,000, respectively.  At the time of purchase, the titles to the building and the parking lot were held in the names of decedent and Ms. Fratini as joint tenants.  On March 18, 1977, Ms. Fratini executed a quitclaim deed to Valencia in favor of decedent as

part of their marital dissolution proceeding.  By grant deed, on December 10, 1987, decedent transferred to Ms. Friedeberg an undivided one-half joint tenancy interest in Valencia.  The parties agree that the fair market value of Valencia on the date of decedent's death was $965,000.

From 1964 until his death, decedent owned a cottage located at 2437 South Fitch Road (South Fitch), Healdsburg, California.  On August 21, 1964, decedent and Ms. Fratini acquired title to South Fitch as joint tenants for $9,600.  In 1970, decedent acquired an adjacent lot at a cost of $2,000.  Hereinafter, we shall refer to the cottage and the adjacent lot as South Fitch.  On December 10, 1987, decedent transferred to Ms. Friedeberg an undivided one-half joint tenancy interest in South Fitch.[2]  The parties agree that the fair market value of South Fitch on the date of decedent's death was $29,000.

From 1965 until his death, decedent owned a 10-unit apartment building located at 130 Acadia Street (Acadia), San Francisco, California.  The original purchase price of Acadia was $128,869.  As a result of his divorce from Ms. Fratini, decedent ended up with an undivided 10-percent interest in Acadia.  On

---

[2]It is unclear whether incident to her divorce Ms. Fratini deeded her one-half interest in South Fitch to decedent prior to decedent's transferring a one-half joint tenancy in South Fitch to Ms. Friedeberg.  Because the parties agree on the fair market value of the South Fitch property, we need not address this issue.

December 10, 1987, decedent transferred to Ms. Friedeberg an undivided one-half joint tenancy interest in his 10-percent undivided interest in Acadia.  The fair market value of the 10-percent undivided interest in Acadia on the date of decedent's death was $25,000.

Prior to and during the time Ms. Friedeberg lived with decedent, she received various payments from the German Government.  Beginning in 1954, Ms. Friedeberg received payments under a German restitution law as a result of her internment in a German concentration camp.  From 1954 to 1966, Ms. Friedeberg received a total of $8,774.02 in restitution payments.  Beginning in 1965 and through the date of decedent's death, Ms. Friedeberg also received monthly payments from the German Government totaling approximately $64,500.

After decedent and Ms. Friedeberg began living together, Ms. Friedeberg received several other amounts.  On August 26, 1976, pursuant to a marital settlement agreement, Ms. Friedeberg received $15,000.  On December 8, 1981, Ms. Friedeberg received a distribution in the amount of $29,177.53 from the estate of Lucian Lubinski.  On or about November 5, 1983, Ms. Friedeberg received $7,500 as a preliminary distribution from the estate of Hirtha Gray.  Ms. Friedeberg also received a final payment on or about May 13, 1985, from the estate of Hirtha Gray in the amount of $6,185.46.

Decedent and Ms. Friedeberg jointly obtained interests in several other properties after they began living together. On February 10, 1983, decedent and Ms. Friedeberg acquired property located at 406 Chenery Street (Chenery), San Francisco, California, as joint tenants. The total downpayment for Chenery of $31,841.50 consisted of $1,000 cash and a check dated March 10, 1983, for $30,841.50. The cash and the check funds were drawn from a checking account held at California Federal Savings Bank, which account was in the joint names of decedent and Ms. Friedeberg. The parties agree that the fair market value of Chenery as of the date of decedent's death was $250,000.

On September 12, 1984, decedent and Ms. Friedeberg acquired property located at 941 Dolores Street (Dolores), San Francisco, California, as joint tenants. The purchase price of Dolores was $290,000. The escrow closing statement for the purchase of Dolores shows that a downpayment of $59,514.98 was made in the form of a deposit, and the closing statement names both decedent and Ms. Friedeberg as the parties making the downpayment. On September 13, 1984, as part of the purchase transaction, decedent and Ms. Friedeberg assumed a previous loan from American Savings and Loan Association in the amount of $117,218.39 payable to the previous owners of the property. Decedent and Ms. Friedeberg also signed a note secured by a deed of trust in the amount of $112,781.61 payable to the previous owners. The parties agree

that the fair market value of Dolores as of the date of decedent's death was $435,000. As of June 15, 1992, there was a mortgage loan balance from American Savings on the Dolores property of $79,387.24.

On March 27, 1985, decedent and Ms. Friedeberg acquired property located at 84 Onondaga Street, San Francisco, California, as joint tenants for $245,000. A downpayment of $47,817.16 was made as part of the Onondaga purchase transaction. Part of the downpayment consisted of a $100 check signed by Ms. Friedeberg dated February 15, 1985, drawn from an account held at Bank of America.[3] The remainder of the downpayment was paid with two checks drawn upon a joint account in the names of decedent and Ms. Friedeberg with Continental Savings and Loan dated February 27 and April 25, 1985. As part of the purchase transaction, decedent and Ms. Friedeberg signed a promissory note for $196,000 payable to the World Savings and Loan Association as lender. The parties agree that the fair market value of Onondaga as of the date of decedent's death was $340,000.

In addition to land and buildings, decedent and Ms. Friedeberg maintained joint bank accounts and purchased a number of certificates of deposit with funds drawn from those accounts. On April 6, 1979, Ms. Friedeberg closed her personal savings

---

[3]It is not clear whether the account from which the $100 was drawn was a joint account; decedent's name appears at the top of the check, and Ms. Friedeberg signed the check.

account with Bank of America by withdrawing the balance of $4,000. On the same day, a withdrawal of $16,000 was made from decedent's and Ms. Friedeberg's joint savings account with Bank of America, and a $20,000 certificate of deposit (CD) was purchased in the joint names of decedent and Ms. Friedeberg. Approximately 6 months later, on October 5, 1979, decedent and Ms. Friedeberg jointly purchased a CD for $20,000 to mature on or about April 4, 1980.

On October 8, 1979, a withdrawal of $10,000 was made from decedent's and Ms. Friedeberg's joint savings account with Bank of America. On the same date, decedent and Ms. Friedeberg jointly purchased a CD in the amount of $10,000 to mature on or about April 7, 1980.

On January 14, 1980, a $10,000 withdrawal was made from decedent's and Ms. Friedeberg's joint savings account with Bank of America. On the same date, decedent and Ms. Friedeberg jointly purchased a CD in the amount of $10,000 to mature on July 14, 1980. In addition to the foregoing CD's, decedent and Ms. Friedeberg jointly owned a number of other CD's, which were purchased with either funds received from existing CD's that matured or funds from other sources.

On or about December 15, 1987, a fire occurred at the Dolores property. Decedent and Ms. Friedeberg received a total of $50,471.61 pursuant to a property claim agreement with State

Farm Fire and Casualty Co.  The funds from the fire insurance
settlement were deposited on March 18, 1988, into a joint savings
account held at Continental Bank in decedent's and Ms.
Friedeberg's names.  The Continental account was closed on March
6, 1989, and the closing balance was $100,390.73.  The funds from
the Continental account were invested and reinvested in several
CD's in the joint names of decedent and Ms. Friedeberg held at
Southern California Savings, Gibraltar Savings, and California
Federal Bank.

On September 17, 1990, decedent and Ms. Friedeberg opened a
joint CD at California Federal Bank.  The balance of this CD, as
of the date of decedent's death, was $100,000.  Decedent and Ms.
Friedeberg also had a balance of $26,244 in a joint checking
account held with Bank of America.  A second joint checking
account was also held at Bank of America, which had a balance of
$3,480 as of the date of decedent's death.  Decedent and Ms.
Friedeberg also had a joint savings account with Bank of America
with a balance of $5,214 as of decedent's date of death.

In 1988 and 1989, decedent reported on his individual
Federal income tax return rental income and loss from the
Valencia, Chenery, Dolores, Onondaga, and South Fitch properties.
Ms. Friedeberg did not report rental income or loss on her
Federal income tax returns for 1988 and 1989.  For the years 1990
through 1992, decedent and Ms. Friedeberg both reported income

and loss from the rental properties. For the years 1981 through 1992, Ms. Friedeberg reported taxable interest income of $133,051. With respect to the $133,051 of interest income reported, approximately $3,440 was earned from accounts titled in Ms. Friedeberg's name alone.

Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, was timely filed for decedent's estate on September 4, 1993. On Schedule E, Part 2, of the Form 706, 11 items of property, which decedent held in joint tenancy with Ms. Friedeberg, were reported. With respect to the 11 items, decedent's estate reported contribution credits under section 2040 and fractional interest discounts on certain of the 11 items. The following table sets forth the amounts reflected on Schedule E, Jointly Owned Property, of Form 706 with respect to the value of the interests reported upon the date of death before the section 2040 credit,[4] percentage of property included after taking section 2040 contribution credits, value after taking section 2040 contribution credits, fractional interest discounts claimed, and values included in decedent's gross estate after fractional discounts taken by decedent's estate:

---

[4]Although these amounts were not directly listed on Schedule E, the amounts were calculated and added to the table as a mathematical computation, using the value on the return divided by the fractional discount and divided by the sec. 2040 contribution credit rate.

| No. | Description | Value of Fee Simple Interest | Sec. 2040 Percent Included Per Form 706 | Form 706 Value Before Fractional Discount | Form 706 Fractional Interest Discount Percentage Claimed | Form 706 Returned Value |
|---|---|---|---|---|---|---|
| 1 | Checking Acct. #1 | $26,244 | 50.00 | $13,122 | -- | $13,122 |
| 2 | Savings Acct. | 5,214 | 50.00 | 2,607 | -- | 2,607 |
| 3 | Checking Acct. #2 | 3,480 | 50.00 | 1,740 | -- | 1,740 |
| 4 | CD | 100,000 | 50.00 | 50,000 | -- | 50,000 |
| 5 | Laidley | 275,000 | 100.00 | 275,000 | 15 | 233,750 |
| 6 | Valencia | 965,000 | 78.87 | 761,096 | 15 | 646,932 |
| 7 | South Fitch | 29,000 | 78.39 | 22,733 | 15 | 19,323 |
| 8 | Chenery | 250,000 | 53.68 | 134,200 | 15 | 114,070 |
| 9 | Dolores | 435,000 | 53.67 | 233,465 | 15 | 198,444 |
| 10 | Onondaga | 400,000 | 55.32 | 221,280 | 15 | 188,088 |
| 11 | Acadia | 90,000 | 100.00 | 90,000 | 35 | 58,500 |

In the notice of deficiency, respondent determined that decedent's estate was not entitled to claim any credit pursuant to section 2040 or fractional interest discounts in any amount on the parcels of real property described as items 5 through 11 on Schedule E of Form 706.

On Form 706, Schedule K, Debts of the Decedent, and Mortgages and Liens, decedent's estate claimed deductions for, among other things, a portion of the mortgages related to the Dolores and Onondaga properties. On Schedule K, decedent's estate allocated the mortgages on the properties in amounts equal to the section 2040 inclusion percentages for the respective pieces of property. The following table contains amounts related to the deductions for mortgages on the Dolores and Onondaga properties, which amounts were reported on Schedule K:

| Item No. | Mortgage Description | Loan Balance | Percent Included | Claimed Balance |
|----------|---------------------|--------------|------------------|-----------------|
| 1 | Dolores | $79,387 | 53.67 | $42,607 |
| 2 | Onondaga | 127,756 | 55.32 | 70,969 |

In the notice of deficiency, respondent determined that decedent's estate was entitled to deduct one-half of the date-of-death balances of the mortgages related to the Dolores and Onondaga properties.

## OPINION

### Section 2040 Contribution Credits

We must first decide whether the estate is entitled to contribution credits pursuant to section 2040 regarding the value of the real properties, bank accounts, and certificates of deposit that were held in the joint names of decedent and Ms. Friedeberg on the date of decedent's death. In the notice of deficiency, respondent denied the section 2040 contribution credits claimed by decedent's estate and required the estate to include 100 percent of the fair market value of the assets held in joint tenancy with Ms. Friedeberg.

Petitioner[5] argues that Ms. Friedeberg contributed money and money's worth in services with respect to properties owned as joint tenants by decedent and Ms. Friedeberg. Petitioner argues that these contributions of money or money's worth in services constitute adequate consideration for Ms. Friedeberg's ownership interest in each of the contested assets. Petitioner ultimately argues that due to Ms. Friedeberg's alleged ownership interest, the estate is entitled to contribution credits under section 2040(a) for 50 percent of the value of each of the contested assets.

Respondent argues that decedent's estate has failed to prove by a tracing of funds or otherwise that Ms. Friedeberg contributed her separate property or services for her interests in the jointly owned assets entitling the estate to credits under section 2040(a).

Section 2040 governs the value of jointly owned property to be included in a decedent's estate. Section 2040(a) provides in pertinent part:

> (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants with right of survivorship by the decedent and any other person, or as tenants by the entirety by decedent and spouse, or deposited, with any person carrying on the

---

[5]Throughout this opinion, we shall refer to both decedent's estate and Ms. Friedeberg, in her capacity as personal representative of the estate, as petitioner.

banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from decedent for less than an adequate and full consideration in money or money's worth: * * *

Section 2040 establishes a "contribution test", whereby the estate of the deceased joint tenant must generally include the value of the entire property less the portion of the property attributable to the consideration furnished by the surviving joint tenant.[6]  Hahn v. Commissioner, 110 T.C. 140, 144 (1998). If part of the consideration is found to have been contributed in money or money's worth by the surviving joint tenant, then the part of the value of the property that is proportionate to such consideration is not included in decedent's gross estate.  Estate of Anderson v. Commissioner, T.C. Memo. 1989-643; sec. 20.2040-1(a)(2), Estate Tax Regs.

Petitioner first argues that Ms. Friedeberg contributed consideration in the form of "money" to the value of the assets

---

[6]In 1976, subsec. (b) of sec. 2040 was added to the Code by sec. 2002(c)(1) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1855.  The 1976 amendment created a special rule where the joint tenants were husband and wife.  Hahn v. Commissioner, 110 T.C. 140, 145 (1998).  If the interest were a "qualified joint interest", only one-half of the value of the property owned in joint tenancy was includable in decedent's gross estate, without regard to which spouse furnished the consideration to acquire the jointly held property.  Id. Decedent and Ms. Friedeberg were never married.  Therefore, sec. 2040(b) does not operate to affect the amount includable in decedent's estate.

in decedent's estate.  Petitioner argues that Ms. Friedeberg contributed her separate funds to jointly held bank accounts and thereafter, decedent and Ms. Friedeberg invested in various money market securities and real properties in which they sought to maximize income and acquire additional real property.

Section 2040 creates a rebuttable presumption that the value of the entire property is includable in the deceased joint tenant's estate, and the burden of showing original ownership or contribution to the purchase price by the surviving joint tenant falls upon the estate.  Hahn v. Commissioner, supra at 144; Estate of Heidt v. Commissioner, 8 T.C. 969 (1947), affd. per curiam 170 F.2d 1021 (9th Cir. 1948); sec. 20.2040-1(a)(2), Estate Tax Regs.  Where evidence indicates that the surviving joint tenant did contribute money or money's worth under section 2040, courts have held that the executor's burden has been met notwithstanding that the exact amount of the contribution could not be proven by the taxpayer.  Estate of Carpousis v. Commissioner, T.C. Memo. 1974-258; Estate of Selecman v. Commissioner, a Memorandum Opinion of this Court dated Nov. 6, 1950.  In those circumstances, we have applied the rule enunciated in Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), and allowed taxpayers to approximate where amounts were not definitely determinable.  See, e.g., Estate of Carpousis v. Commissioner, supra; Estate of Selecman v. Commissioner, supra.

With respect to amounts that Ms. Friedeberg received after June 1974, the point at which Ms. Friedeberg and decedent began living together, Ms. Friedeberg claims that she received total monthly restitution payments of $57,220.15 from the German Government.  Ms. Friedeberg also received $15,000 in August 1976 as a result of her divorce.  Ms. Friedeberg received a distribution from the estate of Lucian Lubinski of $29,177.53 on December 8, 1981.  On November 5, 1983, and May 13, 1985, Ms. Friedeberg received $7,500 and $6,185.46, respectively, from the estate of Hirtha Gray.

From the above-listed amounts, Ms. Friedeberg contributed $4,000 to the purchase of a jointly owned CD in July of 1979.  In or around October of 1980, Ms. Friedeberg purchased a CD in the amount of $10,000 in her name with the money she received as restitution payments from the German Government.  Upon maturity of the $10,000 CD, Ms. Friedeberg testified that the proceeds were ultimately contributed to the purchase of a CD in the joint names of decedent and Ms. Friedeberg.  Ms. Friedeberg testified that during 1981 she contributed the $29,177 she received from the estate of Lucian Lubinski toward the purchase of a CD in the amount of $30,000 in the joint names of herself and decedent.

As evidence, Ms. Friedeberg offered a number of items in support of her testimony.  Ms. Friedeberg offered summary schedules showing that she received from the German Government a

total of $57,220.15[7] from June 1974 to June 2, 1992, the date of decedent's death. Ms. Friedeberg also offered bank statements dated in early 1981, which indicate that she owned a CD in the amount of $10,000. Ms. Friedeberg offered numerous bank statements that indicated that CD's were later purchased in the joint names of decedent and herself in amounts corresponding to the amounts Ms. Friedeberg testified that she and decedent purchased. Ms. Friedeberg offered probate documents from the Superior Court of San Francisco County, California, dated March 2, 1981, indicating that she received a distribution of

---

[7]The summary schedule shows the following payments:

| Year | Amount |
|------|--------|
| 1974 | $989.01 |
| 1975 | 1,678.64 |
| 1976 | 1,551.11 |
| 1977 | 1,809.42 |
| 1978 | 2,544.75 |
| 1979 | 2,967.07 |
| 1980 | 3,152.23 |
| 1981 | 2,378.02 |
| 1982 | 2,290.68 |
| 1983 | 2,509.46 |
| 1984 | 2,225.48 |
| 1985 | 2,284.25 |
| 1986 | 3,147.08 |
| 1987 | 3,907.18 |
| 1988 | 4,048.30 |
| 1989 | 3,851.66 |
| 1990 | 7,267.10 |
| 1991 | 6,284.71 |
| 1992 | 2,334.00 |
| Total | $57,220.15 |

$29,177.53 from the estate of Lucian Lubinski. With respect to the jointly acquired real properties, Ms. Friedeberg testified that the downpayments for Chenery, Dolores, and Onondaga were all paid with funds from bank accounts held in the joint names of decedent and Ms. Friedeberg. The downpayments for the Chenery, Dolores, and Onondaga properties were in the amounts of $31,841.50, $59,514.98, and $47,817.16, respectively, and totaled $139,173.64. The purchases of Chenery, Dolores, and Onondaga were all completed during the years 1983 through 1985. From 1974 to 1985, Ms. Friedeberg has shown that she received at least $71,862.[8] One-half of the total downpayments for the properties would require a contribution of $69,586.82.[9] We find Ms. Friedeberg to be a credible witness, and we accept the veracity of her testimony. Thus, notwithstanding the fact that Ms. Friedeberg was unable to provide every receipt for each bank deposit, purchase of a CD, and receipts for each reinvestment into another CD, it is reasonable to conclude that she contributed one-half toward the total purchase prices of the Chenery, Dolores, and Onondaga properties. <u>Cohan v. Commissioner</u>, <u>supra</u>.

---

[8]This amount includes $15,000 from Ms. Friedeberg's divorce, a $4,000 contribution, $10,000 from the CD purchased with German restitution funds, $29,177 from the estate of Lucian Lubinski, and $13,685 from the estate of Hirtha Gray.

[9]One-half of $139,173.64 equals $69,586.82.

Petitioner also argues that Ms. Friedeberg provided services in the form of management of the rental properties from 1974 until 1992. Petitioner argues that these services constitute adequate consideration contributed in "money's worth" to the values of the Laidley, Valencia, South Fitch, and Acadia properties, such that petitioner is entitled to exclude one-half of the total value of these properties from decedent's estate under section 2040(a). Respondent asserts that the services Ms. Friedeberg performed were minimal and that petitioner has not established a value for Ms. Friedeberg's services.

Our determination of whether Ms. Friedeberg provided full and adequate consideration is necessarily one of fact. See Estate of Heidt v. Commissioner, 8 T.C. at 974; Estate of Anderson v. Commissioner, T.C. Memo. 1989-643. In determining the consideration furnished by the surviving joint tenant, amounts furnished by decedent to the surviving joint tenant for less than full and adequate consideration are to be ignored. Estate of Anderson v. Commissioner, supra; sec. 20.2040-1(a)(2), Estate Tax Regs. If part of the consideration is found to have been contributed by the surviving joint tenant, then the part of the value of the property as is proportionate to such consideration is not included in decedent's gross estate. Sec. 20.2040-1(a)(2), Estate Tax Regs.

In the instant case, Ms. Friedeberg testified that for a number of years she managed the rental properties.  In support of Ms. Friedeberg's testimony, petitioner offered a number of check registers indicating that Ms. Friedeberg regularly kept the financial records regarding income and expenses related to the rental properties.  Ms. Friedeberg submitted a substantial number of documents regarding the rental properties from sellers, insurance companies, mortgage banks, tenants, and title companies addressed to both decedent and Ms. Friedeberg.  Ms. Friedeberg submitted many letters from tenants of the rental properties addressed to her alone.  She had signature authority over the joint accounts and regularly wrote checks and paid expenses related to the rental properties.  Ms. Friedeberg maintained the buildings on the rental properties by providing janitorial services and maintaining the landscape.  We find that Ms. Friedeberg did provide various services including management of the properties, maintenance, and janitorial services.

Petitioner introduced Mr. Paul Chahin as an expert witness, and offered his expert report for the purpose of proving the fair market value of the real estate management and other services provided by Ms. Friedeberg.  In his report, Mr. Chahin indicated that his valuation was based on an understanding that Ms. Friedeberg managed the Valencia property and the properties which decedent and Ms. Friedeberg jointly acquired.  Mr. Chahin

indicated in his report that, based on his experience as a property manager, the property management, leasing, janitorial and maintenance services performed by Ms. Friedeberg had an average fair market value of $24,000 per year.

Mr. Chahin's report did not distinguish between the amount of services provided for each of the different properties based on the number of rental units in each building or otherwise. Mr. Chahin's report did not distinguish a difference in value over the course of 18 years, notwithstanding the fact that more units were acquired over time. The report simply states that the fees charged in general have remained "relatively constant in California since the early 1980's." Also, it is unclear from Mr. Chahin's report which properties the valuation is based on. Mr. Chahin's report does not appear to address the Laidley, South Fitch, or Acadia properties. Because the value assigned by Mr. Chahin is arrived at in a conclusory fashion, without taking into account the changes in the amount of services or the value of the services over time, Mr. Chahin's report does not persuade us that the value of Ms. Friedeberg's services was $24,000 per year, and we are not bound by it. Parker v. Commissioner, 86 T.C. 547, 561 (1986).

Even assuming that we accepted a value of $24,000 per year, petitioner has not offered evidence as to which among the various rental properties the value should be allocated or in what

proportion. As stated previously, Ms. Friedeberg did credibly testify that she provided regular and substantial services in respect to the rental properties including Valencia and South Fitch. On Form 706, petitioner reported section 2040 contribution credits related to Valencia and South Fitch of 21.13 percent and 21.61 percent, respectively. Because petitioner has not provided us with sufficient evidence in order to make a specific allocation of Ms. Friedeberg's services amongst the properties to which the services relate, we find the percentages listed on the initial Form 706 to be probative in making a reasonable allocation of the value of Ms. Friedeberg's services. Using our best judgment under these circumstances, we hold that petitioner is entitled to section 2040 contribution credits for Valencia and South Fitch of 21.13 percent and 21.61 percent, respectively. Cohan v. Commissioner, supra.

However, petitioner has not offered any evidence which would persuade us that Ms. Friedeberg performed substantial services in connection with the Laidley or Acadia properties. Petitioner reported no contribution credits on Form 706 for the Laidley and Acadia properties. Although Ms. Friedeberg testified that she regularly cleaned Laidley, she also resided in Laidley with decedent for all the years in which she and decedent lived together. Laidley was never used as a rental property. Also, decedent did not receive any rental income from Acadia subsequent

to his divorce from Ms. Fratini. Therefore, based on petitioner's initial allocation on Form 706 of 100 percent of the value of both Laidley and Acadia and because petitioner did not provide us with sufficient evidence in order to allocate any of Ms. Friedeberg's services to either the Laidley or Acadia properties, we find that petitioner has failed to carry the burden of proving that adequate consideration in money's worth was contributed by Ms. Friedeberg to the joint interests in the Laidley or Acadia properties. Sec. 2040; Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

With respect to the remaining assets, petitioner argues that the estate is entitled to deduct one-half of the date-of-death value of two checking accounts containing $29,724,[10] a savings account containing $5,214, and a CD valued at $100,000.

Generally, income produced by property belongs to the person who owns the property at the time the property produces such income and does not originate with a donor who has made a completed gift of that property prior to the production of such income. Harvey v. United States, 185 F.2d 463, 467 (7th Cir. 1950); see also Estate of Howard v. Commissioner, 9 T.C. 1192, 1202-1203 (1947); sec. 20.2040-1(c)(5), Estate Tax Regs. Where a surviving joint tenant receives property gratuitously from a

---

[10]The first checking account contained $26,244, and the second checking account contained $3,480.

decedent, the property thereafter produces income, and the income is used as consideration for the acquisition of the jointly held property, the income from the time of receipt of the gift has been held to be the surviving joint tenant's income.  Estate of Goldsborough v. Commissioner, 70 T.C. 1077, 1083 (1978), affd. without published opinion 673 F.2d 1310 (4th Cir. 1982); see also Harvey v. United States, supra; Estate of Howard v. Commissioner, supra.

As we previously stated, the Dolores, Chenery, and Onondaga properties were jointly purchased and owned equally by decedent and Ms. Friedeberg.  On or about December 10, 1987, decedent transferred an undivided one-half joint tenancy interest in each of the remaining properties including Laidley, Valencia, South Fitch, and Acadia to Ms. Friedeberg.  From 1988 through 1991, decedent and Ms. Friedeberg reported $325,831.67[11] of net rental income from all the jointly held properties.

Ms. Friedeberg testified that amounts received through rental of the properties were equally shared and deposited in the

---

[11]Net profits from rentals were reported as follows:

| Year | Amount |
|------|--------|
| 1988 | $46,406.49 |
| 1989 | 68,744.73 |
| 1990 | 89,085.41 |
| 1991 | 121,595.04 |
| Total | $325,831.67 |

jointly owned bank accounts and were used regularly to purchase CD's.  For the time period after December 10, 1987, decedent and Ms. Friedeberg, as joint owners of the properties, equally shared the net rentals.  Again, we accept the veracity of Ms. Friedeberg's testimony and find that the rental income received and deposited into joint accounts constitutes sufficient consideration such that Ms. Friedeberg acquired a 50-percent ownership interest in the bank accounts and CD deposits as of the date of decedent's death.  Therefore, we hold that petitioner is due a contribution credit pursuant to section 2040 equal to 50 percent of the joint bank account holdings in the savings, checking, and CD accounts.

Fractional Interest Discounts

In determining the amount included in decedent's estate pursuant to section 2040, petitioner reduced the value of decedent's interest in several of the jointly held real properties by fractional interest discounts.  Petitioner argues that the reported discounted fair market values of the joint tenancy interests in Laidley, Valencia, South Fitch, Chenery, Dolores, and Onondaga are valid.  In the notice of deficiency, respondent disallowed the claimed fractional discounts.

In our recent opinion in Estate of Young v. Commissioner, 110 T.C. 297 (1998), we addressed the issue of whether, and to

what extent, a fractional interest discount or lack of marketability discount should be applied to a decedent's property held in joint tenancy with right of survivorship. In Estate of Young v. Commissioner, supra at 315-316, we stated:

> Under the scheme of section 2040(a), the amount includable in a decedent's gross estate does not depend on a valuation of property rights actually transferred at death, or on a valuation of the actual interest held by the decedent (legal title); instead, decedent's gross estate includes the entire value of property held in a joint tenancy by him and any other person, except to the extent the consideration for the property was furnished by such other person. * * * Section 2040(a) provides an artificial inclusion of the joint tenancy property: the entire value of the property less any contribution by the surviving joint tenant. Except for the statutory exclusions in section 2040(a), there is no further allowance to account for the fact that less than the entire interest is being included. [Citation and fn. ref. omitted.]

Applying the same reasoning to the instant case, we conclude that petitioner is not entitled to fractional interest discounts on any of the properties based on joint ownership with Ms. Friedeberg.

Section 2053 Deductions for Unpaid Mortgages

On Schedule K of Form 706, petitioner claimed deductions related to mortgages on the Dolores and Onondaga properties of $42,607 and $70,969, respectively. Petitioner allocated the mortgages on the properties in amounts equal to the section 2040 inclusion percentages of 53.67 for the Dolores property and 55.32

for the Onondaga property.  In the notice of deficiency, respondent limited the deductions to 50 percent of each of the outstanding mortgages.

Section 2053(a)(4) generally provides that a deduction is allowable for the amount of unpaid mortgage on property where the value of decedent's interest therein is included in the value of the gross estate.  Section 20.2053-7, Estate Tax Regs., provides that a deduction is allowed if the value of the property, undiminished by the amount of the mortgage or indebtedness, is included in the value of the gross estate.  Generally, in the case of joint tenancy real property, the amount deductible from a decedent's estate is limited to the portion of the mortgage which the estate is obligated to pay.  Parrott v. Commissioner, 30 F.2d 792 (9th Cir. 1929), affg. 7 B.T.A. 134 (1927).

Both decedent and Ms. Friedeberg signed the note and deed of trust securing the note for the Dolores property.  Similarly, both decedent and Ms. Friedeberg signed the promissory note as part of the purchase of the Onondaga property.  Petitioner does not argue that under California law the estate is ultimately obligated to pay more than one-half of the outstanding date-of-death mortgage balances upon the Dolores and Onondaga properties.  Therefore, we sustain respondent's determination that petitioner is entitled to deduct 50 percent of the date-of-death balances of

the mortgages related to the Dolores and Onondaga properties. Parrott v. Commissioner, supra.

Decision will be entered

under Rule 155.